**BEERMAN REALTY COMPANY, Appellant,**

v.

**ALLOYD ASBESTOS ABATEMENT COMPANY, Appellee.**

[Cite as *Beerman Realty Co. v. Alloyd Asbestos Abatement Co.* (1995), 100 Ohio App.3d 270.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 14650.

Decided Jan. 11, 1995.

*John Henry Phillips*, for appellant.

*Gary W. Auman* and *Matthew D. Stokely*, for appellee.

BROGAN, Judge.

Appellant Beerman Realty Co. ("Beerman") appeals from the decision of the Montgomery County Court of Common Pleas sustaining a summary judgment motion against it. Beerman raises three assignments of error on appeal, asserting that the trial court's decision was contrary to law.

This case arises from two asbestos removal projects conducted in Dayton, Ohio. Beerman, a real estate management company, owns and operates several buildings in the Dayton area, including two buildings which Beerman planned to have demolished. Alloyd Asbestos Abatement Company ("Alloyd") is a corporation in the business of removing asbestos from buildings.

On September 28, 1987, Beerman entered into a contract with Cornett Trucking Company to demolish a building at 22–34 East Third Street in Dayton, Ohio.

Cornett subcontracted with Alloyd to remove the asbestos from the building in accordance with Environmental Protection Agency ("EPA") standards prior to the demolition. The record does not contain a copy of the subcontract.

On November 16, 1988, Beerman contracted directly with Alloyd to remove asbestos from a building located at 14 South Main Street to prepare the building for demolition. That contract specified the location of the asbestos to be removed and required the removal to be done in accordance with applicable EPA regulations.

Subsequent to Alloyd's removal of asbestos from the building sites, inspectors from the Regional Air Pollution Control Agency inspected both buildings and found violations of environmental laws and regulations. The alleged violations included failing to ensure that friable asbestos materials which had been removed remained wet until disposal, and also failing to remove friable asbestos from the building prior to its demolition.

As a result of the violations, the federal EPA filed a civil action against Beerman and Alloyd in United States District Court for violation of the Clean Air Act, Sections 7412–7413, Title 42, U.S.Code, and violation of the federal regulations for the removal of asbestos, the National Emission Standards of Hazardous Air Pollutants ("NESHAP"), Section 61.147, Title 40, C.F.R.[1] As relief, the EPA sought enjoinment of future violations and the assessment of civil penalties against both Beerman and Alloyd individually.

The EPA subsequently settled its claim against Beerman, which agreed to pay a $10,000 civil penalty to the government as part of the settlement. At the time of the trial court's decision in this case, the EPA had also settled its claim against Alloyd, contingent upon Alloyd's paying a civil penalty of an undisclosed amount pending entry of a consent decree. Neither Beerman nor Alloyd admitted any liability as part of their respective settlements with the EPA.

On September 27, 1993, Beerman filed a complaint in the Montgomery County Court of Common Pleas against Alloyd for breach of contract and unjust enrichment. In its first two causes of action, Beerman alleged that it had suffered damages as a result of Alloyd's breach of contract for the asbestos removal at both building sites. Beerman requested indemnification for the $10,000 civil penalty it had paid to the government, as well as the attorney fees of approximately $53,000 incurred by Beerman in defense of the EPA action. In its third cause of action, Beerman alleged that Alloyd had been unjustly enriched by being paid additional amounts over the contract price to finish removing asbestos

---

1. Pursuant to Section 112 of the Clean Air Act, Section 7412, Title 42, U.S.Code, the Administrator of the EPA is required to develop NESHAP. A violation of a NESHAP standard constitutes a violation of the Clean Air Act. Section 7412, Title 42, U.S.Code.

from the South Main Street building after the violations were discovered. Beerman sought to recover the additional $3,000 it paid Alloyd to remove the asbestos in compliance with the federal regulations.

On April 29, 1994, Beerman filed a motion for partial summary judgment on the issue of Alloyd's liability for the breach of contract and unjust enrichment claims. On the same date, Alloyd filed a motion for partial summary judgment on the issue of recoverability of attorney fees.

On May 27, 1994, the trial court sustained Alloyd's motion for summary judgment and overruled Beerman's motion for summary judgment. In so doing, the trial court made the following findings: (1) Beerman's attorney fees were not recoverable under Ohio's general rule that when "multiple parties are defendants in litigation, each bears the cost of his or her own defense"; (2) Beerman's claim for recovery of the $10,000 civil penalty was actually a claim for implied indemnity, which was unenforceable because such indemnity contravenes the public policy underlying the Clean Air Act to impose strict liability on both owners and operators of demolition sites; and (3) genuine issues of material fact existed as to whether Alloyd was liable to Beerman for its unjust enrichment claim because the parties' intentions regarding the contract needed to be resolved.

Beerman subsequently dismissed its claim for unjust enrichment without prejudice in order to immediately appeal the trial court's decision regarding the recoverability of the civil penalty and attorney fees. Beerman then filed a timely notice of appeal.

■ Beerman raises three assignments of error on appeal, claiming that the trial court's decision was contrary to law. As its first assignment of error, Beerman raises the following:

"I. The trial court erred in holding that Beerman is not entitled to indemnification from Alloyd."

In support of this assignment of error, Beerman argues that the public policy underlying the Clean Air Act does not prohibit indemnification for civil penalties and, thus, Beerman should be entitled to proceed with its action for common-law indemnification against Alloyd. In opposition, Alloyd argues that the trial court correctly held that public policy prohibits indemnification for civil penalties under the Clean Air Act because the statute imposes strict liability on both owners and operators of demolition sites for violations of the Act.

In this case, Beerman, the owner of the buildings, and Alloyd, the operator of the asbestos removal operation, were both sued for individual civil penalties by the EPA. Neither party disputes that each was independently liable for these penalties. It is well established that more than one party at a demolition site

may be fined for environmental violations. The regulations clearly apply to both owners and operators of demolition operations and each violating party may be fined. See *United States v. Geppert Bros., Inc.* (E.D.Pa.1986), 638 F.Supp. 996.

■ In *Geppert Bros.*, the United States brought a civil penalty action against both the building owner and the asbestos removal contractor. The trial court struck the building owner's affirmative defense that he had contracted with the removal company to remove the asbestos in accordance with the EPA standards and thus should not be held personally liable for any violations. The court held that both the building owner and the contractor were individually liable for the violations. Thus, in a civil penalty action, it is not a valid defense that the defendant merely owned the building and contracted with another party for the removal of the asbestos. Both parties may be sued by the EPA for civil penalties. In the present case, Beerman did not attempt to assert an affirmative defense in the original penalty action but, instead, has brought a subsequent action for indemnification. Unfortunately, *Geppert Bros.* does not address the issue of whether an indemnification action may be brought.

The issue for our resolution is whether a building owner may seek indemnification for civil penalties assessed against him under the federal Clean Air Act. The Clean Air Act and the asbestos NESHAP are silent on the issue of whether a party may seek indemnification for civil penalties assessed pursuant to the Act. The statutes neither grant a right of indemnification nor prohibit it. Neither party has cited case law directly addressing the question of whether indemnification for civil penalties under the Clean Air Act would violate the public policy underlying the Act, and we likewise have found none. Further, we find that the cases cited by the parties in support of their respective positions are clearly distinguishable from the present case.

First, Beerman argues that *United States v. Gen. Dynamics Corp.* (N.D.Tex. 1991), 755 F.Supp. 720, stands for the proposition that indemnification is allowed in an environmental civil penalty action. However, we find that case to be distinguishable. In *General Dynamics*, the indemnification was allowed for civil penalties assessed pursuant to violation of a *state* environmental law, not the federal regulations. Further, the trial court did not address the public policy underlying the statute or whether the purpose of the statute would be defeated by allowing indemnification.

Alloyd cites *Geppert Bros.* in support of its argument that indemnification should not be allowed. As discussed above, we find that the *Geppert Bros.* case is also distinguishable. The court in *Geppert Bros.* does not address the specific issue of indemnification.

We have found only two cases which address the specific issue of indemnification in a civil penalty action under the Clean Air Act. However, both cases arise in the context of a cross-claim in the original federal penalty action. Further, the cases do not reach the issue of whether such indemnification violates public policy because the respective trial courts in those cases decided the issue on other grounds. See *United States v. R.E.A.G.* (D.Conn.1989), 730 F.Supp. 482; *United States v. Bank IV Kansas, N.A.* (Dec. 23, 1993), D.Kan. No. 93–2315–JWL, unreported, 1993 WL 545224. Thus, neither case is instructive as to the resolution of the present case.

As no controlling authority exists, we next turn to the underlying purposes of the Clean Air Act to determine whether they would be defeated by allowing a building owner who has been forced to pay civil penalties for violations of that statute to receive indemnification for those penalties. The main purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Section 7401(b)(1), Title 42, U.S.Code. To achieve this purpose, the legislators drafted the civil penalty provision to provide strict liability for violations of the Act:

"[T]he Act and the asbestos NESHAP provide strict liability for civil violations of their provisions. This reading is supported by the language of the Act, the legislative history of the Act and cases construing the Act and emission standards promulgated thereunder. Strict liability is essential to meet the purpose of the Act to protect and improve the quality of the nation's air." *United States v. Ben's Truck & Equip., Inc.* (E.D.Cal.1986), 25 Envt.Rept.Cas. (BNA) 1295, 1298, 1986 WL 15402.

Courts have consistently held that the civil penalty provision imposes strict liability on both owners and operators. *Id.; Geppert Bros., supra; United States v. Hugo Key & Son, Inc.* (D.R.I.1989), 731 F.Supp. 1135; *United States v. Tzavah Urban Renewal Corp.* (D.N.J.1988), 696 F.Supp. 1013.

The specific purpose of imposing strict liability on the building owner is to ensure that "owners of property act responsibly in disposing of their buildings. The regulations prevent the owner of a building from avoiding liability for hazardous substances present in a building by merely contracting with another party to demolish the building." *Geppert Bros., supra,* 638 F.Supp. at 1000. This specific purpose is obviously undermined by allowing a building owner to recover the civil penalty imposed, for if the building owner may escape liability by merely contracting with another party for the removal of the asbestos, then the owner has no incentive to act responsibly in disposing of his building by choosing a dependable contractor and taking measures to adequately supervise the work.

At first glance, it may appear that the building owner would still be encouraged to seek a reputable, dependable asbestos removal company even if indemnification were allowed. It may be argued that the owner would still be inconvenienced by having to bring a subsequent action in state court to recover the penalty, paying attorney fees and costs for the indemnification action, and foregoing the use of the money he has paid for the civil penalty until he recovers it, which potentially could take months or years.

However, in reality, most owners would likely not suffer these inconveniences because they would not wait to assert a later state court action for indemnification. Instead, they could simply assert a cross-claim against the contractor in the federal action. See *R.E.A.G., supra; Bank IV Kansas, supra.* Thus, the entire matter would be resolved in the same action, and the owner would have little incentive to ensure compliance with the provisions of the Act because, although he might be primarily liable to the government for the original payment of the civil penalty, he could recover any penalty assessed against him in the same action.

Further, the legislative history of the civil penalty provision of the Clean Air Act is also instructive. Although indemnification was not specifically addressed, the committee developing the provision specifically discussed the issue of whether to impose penalties only for "knowing" violations or to impose them for all violations. H.R.Rept. No. 94–1175, 94th Cong., 2d Sess., 52–55 (1976). In deciding to impose strict liability even for accidental violations, the committee noted:

"[W]here protection of the public health is the root purpose of a regulatory scheme (such as the Clean Air Act), persons who own or operate pollution sources in violation of such health regulations must be held strictly accountable. This rule of law was believed to be the only way to assure due care in the operation of any such source. Any other rule would make it in the owner or operator's interest not to have actual knowledge of the manner of operation of the source. Moreover, in the Committee's view, the public health is injured just as much by a violation due to negligence or inaction as it is by a violation due to intent to circumvent the law. Thus, the Committee believes that the remedial and deterrent purposes of the civil penalty provision would be better served by not limiting its application to 'knowing' violations.

"Fourth, *the Committee intends to permit any argument about the violator's knowledge, intent, negligence, or culpability to be considered by the courts in deciding how much to fine any violator, rather than in determining whether any enforcement action can be brought in the first place.*" (Emphasis added.) H.R.Rept. No. 94–1175, 94th Cong., 2d Sess., at 53.

Thus, it seems that the legislature intended to impose a harsh regulatory scheme to ensure compliance with the Act.  As stated above, the legislature intended for the federal court to consider Beerman's good faith attempt to comply with the requirements in assessing the amount of the penalty.  However, it seems clear that the legislature did not intend to allow an owner to escape all liability even where the owner has attempted to comply.

The legislature recognized that the imposition of the penalty on seemingly innocent parties may produce a harsh result, but reasoned that such a measure was necessary to comply with the purposes of the Act:

" '[T]he Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur.  The requirements of foresight and vigilence [*sic* ] imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them.' "  H.R.Rept. No. 94–1175, 94th Cong., 2d Sess., at 53–54, quoting *United States v. Park* (1975), 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489.

Further, the legislature specifically addressed measures which could be taken by parties such as building owners to avoid liability for accidental violations:

"In many instances, proper quality control, maintenance, inspection, monitoring, repair, personnel tests, or other measures can prevent or minimize the likelihood of such accidental violations.  The omission or inadequate execution of such prophylactic measures would be a proper basis for enforcement under title I or title II of the Act (as appropriate) just as surely as an intentional violation."  H.R.Rept. No. 94–1175, 94th Cong., 2d Sess., at 54.

In the present case, there is no indication that Beerman did anything to ensure compliance other than contract with a company to have the asbestos removed.  Although other compliance measures, such as having another company monitor the asbestos removal work or inspect the result, may be expensive and seem unduly burdensome, it seems clear that the legislature intended for such drastic measures to be taken by building owners to ensure compliance.

Upon reviewing the legislative history of the civil penalty provisions of the Act and case law interpreting the purpose, we find that allowing indemnification for civil penalties would violate the public policy and contravene the purpose of the Clean Air Act.  The legislature recognized that the provision was harsh, but

apparently found that the important purpose of the Act required such a strict result.

Our finding is strengthened by analogy to the Clean Water Act. Courts have previously recognized that parity exists between the penalty provisions of the Clean Air Act and the Clean Water Act. See *United States v. A.A. Mactal Constr. Co.* (Apr. 10, 1992), D.Kan. No. 89–2372–V, unreported, 1992 WL 245690. In several cases, federal courts have held that indemnification for civil penalties under the Clean Water Act is not allowed. See Annotation (1981), 55 A.L.R.Fed. 141, 178, Section 18. One district court, holding that such indemnification was not allowed, reasoned that "[t]he absence of a third party defense in this penalty provision, the language of the statutes, and the purposes of the various remedies supplied to the Government, lead to the conclusion that no indemnity right was contemplated for the penalty imposed." *Tug Ocean Prince, Inc. v. United States* (S.D.N.Y.1977), 436 F.Supp. 907, 926; see, also, *United States v. Tex–Tow, Inc.* (C.A.7, 1978), 589 F.2d 1310; *Montauk Oil Transm. Corp. v. Tug "El Zorro Grande"* (June 15, 1993), S.D.N.Y. No. 5513, unreported, 1993 WL 213037. We find the reasoning in these cases to be persuasive. Under the Clean Air Act, there is no provision for a third-party defense to the civil penalties. Further, the legislative history of the Act and case law interpreting the Act indicate that the legislature intended to impose a harsh and strict penalty. Although we recognize that not allowing indemnification may seem to impose an unfair burden on a building owner who has attempted to comply with the provisions, we find that the underlying purpose of the statute dictates such a result.

It is well established that indemnification will not be allowed if such indemnification violates public policy. See *Worth v. Aetna Cas. & Sur. Co.* (1987), 32 Ohio St.3d 238, 513 N.E.2d 253; *Cincinnati Ins. Co. v. Diebold, Inc.* (1989), 64 Ohio App.3d 273, 581 N.E.2d 566.

Accordingly, we find that, because allowing a subsequent action for indemnification for the recovery of a civil penalty contravenes public policy, Beerman is not entitled to pursue its indemnification claim in this case. Appellant's first assignment of error is overruled.

■ As its second assignment of error, Beerman raises the following:

"II. The trial court erred in holding that Beerman could not recover its attorneys' fees."

In support of this assignment of error, Beerman argues that, under implied indemnification, it should be allowed to recover the attorney fees it incurred in defending against the civil penalty action as a result of Alloyd's alleged breach of contract. Alloyd argues that no such indemnification should be allowed.

In light of our resolution of the first assignment of error, we find that allowing indemnification for the attorney fees incurred in defending against the civil penalty action would also violate public policy. We find it inharmonious to disallow indemnification for the civil penalty while allowing indemnification for the fees incurred in connection with that penalty.

██  Moreover, "[i]t is the general rule in this state that when multiple parties are defendants in litigation, each bears the costs of his or her own defense." *Krasny–Kaplan Corp. v. Flo–Tork, Inc.* (1993), 66 Ohio St.3d 75, 609 N.E.2d 152. Although significant exceptions to this rule exist, Beerman has not demonstrated that any of them apply to the present case.

Beerman's second assignment of error is overruled.

As its third assignment of error, Beerman raises the following:

"III. The trial court erred by not granting Beerman's motion for summary judgment as to liability against Alloyd for breach of contract."

In support of this assignment of error, Beerman argues that no genuine issues of material fact exist regarding whether Alloyd breached its contract to remove asbestos from the buildings.

We find it unnecessary to consider this assignment of error. In our disposition of Beerman's first and second assignments of error, we found that Beerman would not be entitled to recover the civil penalty or the attorney fees regardless of whether Alloyd had actually breached the contract. Additionally, Beerman has voluntarily dismissed its claim against Alloyd for unjust enrichment. Accordingly, Beerman's third assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

Young, J., concurs.

Fain, J., dissents.

Frederick N. Young, Judge, concurring.

██  I write separately to note my concurrence with both (a) the well-reasoned opinion of Judge Brogan that for reasons of public policy a building owner is not entitled to seek *on common-law grounds* indemnity from a contractor for a civil penalty imposed on the owner for violations of the Clean Air Act and (b) the

dissenting opinion of Judge Fain that the operation of the marketplace should allow indemnification *on contract grounds* from a contractor that has agreed to indemnify the building owner. In the latter case, the owner has presumably paid a premium for that indemnity agreement and has every incentive to award the contract to a financially sound, and therefore more likely successful, contractor. By the same token, a contractor that offers indemnification to an owner has a greater incentive to perform the contract properly under the strictures of the Clean Air Act than if it were not held to account for both its own liability and the owner's liability.

The public policy behind the Clean Air Act would be even better served if contractual indemnification is allowed because of the added incentive for the owner to find a responsible contractor and the increased incentive for a contractor to do the job properly. Those incentives do not exist if the owner can obtain a common-law indemnity or the contractor is irresponsible financially or otherwise. Because I find no contractual indemnification provision in the record before us, affirmance is the proper decision.

FAIN, Judge, dissenting.

In my view, public policy does not clearly preclude an owner from obtaining indemnification from an asbestos removal company when the latter's breach of a contract with the owner proximately causes the imposition of a civil penalty against the owner. Because the marketplace is traditionally the preferred arena for finding the most economically efficient way in which to accomplish an objective, I would not restrict the parties' freedom to contract in the absence of a clear public policy basis for doing so.

*Tug Ocean Prince, Inc. v. United States* (S.D.N.Y.1977), 436 F.Supp. 907, involved the Clean Water Act, which I concede to be analogous to the Clean Air Act. In that case, the trial court elected to remand the cause to the United States Coast Guard for consideration of the mitigation of an owner's liability because of diminished culpability, rather than to impose indemnification against the operator who caused the spill. The trial court seems to have held that indemnification was not provided for by the Clean Water Act, rather than that indemnification as a matter of express or implied contract would violate public policy.

In *United States v. Tex–Tow, Inc.* (C.A.7, 1978), 589 F.2d 1310, 1314–1315, the court expressly disclaimed making any decision with respect to an owner's indemnification by a third party. The court merely held that an owner is strictly

liable for the civil penalty, even though the violation may have been caused by an independent actor.

The public's interest in safe, effective removal of asbestos from buildings containing it is best served by allowing companies specializing in asbestos removal to compete freely in the marketplace, to assure owners, as part of that competition, that they can safely and effectively accomplish the removal of asbestos, and to back up that assurance with an agreement to indemnify the owner for any liability which it may incur as a result of the job's not being properly done. Preventing indemnification restricts freedom of contract, and, in my view, interferes with the ability of the marketplace to establish and to identify those companies that can safely and effectively remove asbestos from older buildings.

It is true that the availability of indemnification as a possible offset to an owner's liability for a civil penalty will have a tendency to reduce the owner's incentive once he has found an asbestos removal company in good financial standing. But, by the same token, the ability of the asbestos removal company to offer indemnification to the owner will enhance the incentive of the asbestos removal company to do a good job, and it is in the best position to ensure that the asbestos is removed safely and effectively. I find no clear public policy in favor of restricting the ability of a company like Alloyd to offer the owner of a building indemnification for any liability to which the owner may be exposed as a result of the job of asbestos removal being improperly performed.

I would reverse the summary judgment in favor of Alloyd, and remand this cause for a trial on both the issue of Alloyd's liability for indemnification of the civil penalty imposed against Beerman, and the issue of Alloyd's liability for the attorney fees incurred by Beerman in defense of the action against it for the civil penalty. In my view, a reasonable jury might find both components of liability to have been reasonably foreseeable as consequential damages as a result of Alloyd's alleged breach of contract.