**UNITED STATES of America, Plaintiff,**

v.

**J & D ENTERPRISES OF DULUTH, Defendant.**

**Civ. No. 5–95–298 (PAM/RLE).**

United States District Court,
D. Minnesota,
Fifth Division.

Feb. 5, 1997.

Friedrich A.P. Siekert, Asst. U.S. Atty., Minneapolis, MN, for U.S.

Carrie C. Green, Minneapolis, MN, for J & D Enterprises of Duluth.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of the Defendant J & D Enterprises of Duluth, Inc. ("J & D") for an Order granting it leave to serve a Summons and Third–Party Complaint upon the City of St. Paul, Minnesota ("St.Paul").

A Hearing on the Motion was conducted on May 30, 1996,[1] at which time the Government appeared by Friedrich A.P. Siekert, Assistant United States Attorney, and J & D appeared by Carrie C. Green, Esq.

For reasons which follow, we deny the Motion.

### II. *Factual Background*

In this action, the Government seeks to impose civil penalties against J & D for alleged violations of Sections 112 and 114 of the Clean Air Act. See, *Title 42 U.S.C. §§ 7412 and 7414.* The alleged violations occurred in connection with the demolition of an abandoned warehouse, that was owned by St. Paul, and that was located at 923 Shepard Road in St. Paul.

By way of additional background, on May 26, 1987, St. Paul condemned the warehouse

---

1. Following the close of the Hearing, we afforded the parties the opportunity to submit supplemental submissions on issues that were raised during the course of oral argument.

in order to facilitate a proposed expansion of Shepard Road, and the City decided to have the warehouse demolished. After a potential bidder complained about the presence of asbestos, St. Paul inspected the site and obtained samples to determine the presence of asbestos-containing materials. Testing revealed that certain ceiling panels contained asbestos at a "hazardous level." Based upon this testing, St. Paul revised its bid specifications to require, among other things, the removal of the asbestos prior to the start of demolition. Among the five bids that were received by St. Paul, for the demolition of the warehouse, J & D's lump sum bid of $18,420, which included $2,200 for the removal of asbestos, was determined to be the lowest. In August of 1991, St. Paul contracted with J & D to raze the warehouse and, on September 18, 1991, J & D commenced the demolition process.

According to the Government, in demolishing the warehouse, J & D violated a number of the Federal regulations which govern the removal of asbestos. Specifically, the Complaint alleges that J & D failed to provide sufficient notice of the contemplated demolition,[2] that it submitted a deficient notice of the demolition after the razing had began,[3] that it failed to remove all of the "Regulated Asbestos Containing Materials ('RACM')" before the demolition was undertaken,[4] that it failed to adequately wet the RACM when it was stripped from the warehouse,[5] and that it failed to ensure that the RACM remained wet until it was collected and contained.[6] In addition, the Government alleges that J & D violated Section 114 of the Act, *Title 42*

U.S.C. § 7414, when it submitted inaccurate answers in response to a formal Request for Information. For relief, the Government seeks civil penalties for each violation, in an amount of up to $25,000 for each day of violation, together with a permanent injunction that would require J & D to fully comply with any pertinent asbestos regulations.

In the Motion before us, J & D seeks leave from the Court to serve and file a Third-Party Complaint against St. Paul. In the proposed Third-Party Complaint, J & D seeks indemnity for all of the civil penalties that may be assessed in this action, and that arise from the demolition of the warehouse. J & D bases its indemnity claim on each of the following theories: breach of contract, breach of an implied warranty, and negligent misrepresentation. Specifically, the proposed Third-Party Complaint alleges that the contract between St. Paul and J & D delegated the notification and asbestos removal responsibilities to St. Paul; that St. Paul, as the owner of the warehouse, breached its implied warranty of site access; and lastly, that St. Paul negligently misrepresented the scope of the work that was required under the demolition contract.

### III. *Discussion*

A. *Standard of Review.* Rule 14(a), Federal Rules of Civil Procedure, provides the procedural mechanism by which a party may assert a Third-Party claim. Rule 14(a) states, in relevant part:

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and com-

**2.** Title 40 C.F.R. § 61.145(b) requires that "[e]ach owner or operator of a demolition or renovation activity * * * shall: (1)[p]rovide the Administrator with written notice of intention to demolish or renovate."

**3.** Title 40 C.F.R. § 61.145(b)(4) requires a notice of demolition to contain, among other details, the procedure that will be employed to detect the presence of "Regulated Asbestos Containing Materials ('RACM')", the scheduled starting and completion dates for the demolition, and the location of the waste disposal site where the RACM will be deposited.

**4.** Title 40 C.F.R. § 61.145(c)(1) requires each owner or operator of a demolition or renovation

activity to "[r]emove all RACM from a facility being demolished or renovated before activity begins that would break up, dislodge, or similarly disturb the material."

**5.** Title 40 C.F.R. § 61.145(c)(3) requires each owner or operator of a demolition or renovation activity to "adequately wet the RACM" when it is "stripped from a facility component while it remains in place in the facility."

**6.** Title 40 C.F.R. § 61.145(c)(6)(i) requires each owner or operator of a demolition or renovation activity to ensure that RACM, which has been removed or stripped, "remains wet until collected and contained or treated in preparation for disposal."

plaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against third-party plaintiff. The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days after serving the original answer. Otherwise, the third-party plaintiff must obtain leave on motion upon notice to all parties to the action.

The governing law makes clear that Rule 14(a) should be liberally construed in favor of impleading a third-party, see, *United of Omaha Life Ins. Co. v. Reed,* 649 F.Supp. 837 (D.Kan.1986), as its purpose is to avoid a circuity of actions and a multiplicity of suits, see, *Dixon v. Northwestern National Bank,* 275 F.Supp. 582 (D.Minn.1967), in order that all related claims may be disposed of in one action, *id.; Patten v. Knutzen,* 646 F.Supp. 427 (D.Colo.1986), and thereby simplify, and expedite, the litigation process. *Blais Construction Co., Inc. v. Hanover Square Associates–I,* 733 F.Supp. 149, 152 (N.D.N.Y. 1990); *Waylander–Peterson Co. v. Great Northern Ry. Co.,* 201 F.2d 408 (8th Cir. 1953).

■ For a proper impleader to occur, the third-party plaintiff must implead a person against whom it can assert a claim of joint or secondary liability, that arises out of the plaintiff's claim against the third-party plaintiff. See, *Erickson v. Erickson,* 849 F.Supp. 453, 456 (S.D.W.Va.1994); *Greene Line Mfg. Corp. v. Fibreboard Corp.,* 130 F.R.D. 397, 399 (N.D.Ind.1990). Otherwise stated, the third-party plaintiff must show that, if it is found to be liable to the plaintiff, then the third-party defendant is, or may be, liable to it. *Resolution Trust Corp. v. Farmer,* 836 F.Supp. 1123, 1129 (E.D.Pa.1993). However, Rule 14 does not itself provide a substantive theory of recovery, for an impleader is available only if there is an under-

lying substantive right to pursue a claim for relief against the third-party defendant. See, *Kim v. Fujikawa,* 871 F.2d 1427, 1434 (9th Cir.1989); *Green v. United States Department of Labor,* 775 F.2d 964, 971 n. 7 (8th Cir.1985); *Ragusa v. City of Streator,* 95 F.R.D. 527, 528 (N.D.Ill.1982) (impleader improper where governing substantive law did not allow for indemnity or contribution).

B. *Legal Analysis.* Given these precepts, J & D's proposed Third–Party Complaint is proper only if St. Paul "is or may be liable" to J & D for all, or part, of any civil penalties that J & D may be assessed in this action. By its proposed Third–Party Complaint, J & D alleges a right to indemnity from St. Paul. Whether a substantive claim may properly be pursued against a third-party, including one for indemnification, is a substantive rather than a procedural question.

■ While it is well-established that, in a diversity action, a Federal Court must apply State law in determining whether there is a substantive right to recovery, see, *Leppala v. Sawbill Canoe Outfitters, Inc.,* 361 F.Supp. 409, 410 (D.Minn.1973), "[t]he fact that a case is brought in federal court on the basis of federal question jurisdiction does not mean that state law on indemnification or contribution is irrelevant." 3 J. Moore, *Moore's Federal Practice* ¶ 14.03[3] at 14–25. Indeed, State law governs the impleader determination where, as here, the Third–Party Complaint is not itself based upon Federal law. See, e.g., *Kennedy v. Pennsylvania R.R.,* 282 F.2d 705, 709 (3rd Cir.1960) (in an action commenced under the Federal Employers' Liability Act, State law doctrine of comparative negligence governed the defendant's third-party complaint) Accordingly, whether St. Paul may be liable to J & D for the claims that have been alleged in the Government's Complaint, must be determined under Minnesota's law of indemnification.[7]

---

7. We are mindful that, in certain limited situations, Federal law may allow a claim for contribution or indemnification, either by Congressional creation or through the power of the Federal Courts to fashion a Federal common law remedy. See, e.g., *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638, 101 S.Ct. 2061,

2065–66, 68 L.Ed.2d 500 (1981). Here, however, J & D makes clear that its proposed third-party claims are founded solely upon State law. Of course, the lack of a Federal cause of action does not necessarily preclude the existence of State law remedies. *Baker, Watts & Co. v. Miles*

Under Minnesota law, "[i]ndemnity and contribution are both remedies based on equitable principles to secure restitution to one who has paid more than his just share of a liability." *Hermeling v. Minnesota Fire & Cas. Co.*, 548 N.W.2d 270, 273 n. 1 (Minn. 1996), quoting *White v. Johnson*, 272 Minn. 363, 367, 137 N.W.2d 674, 677 (1965), overruled on other grounds, *Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362 (1977). In contrast to contribution, which allows one to recover a proportionate share from the other liable party, "[i]ndemnity is the right of one party held liable to another to shift the entire burden of liability to a third party also liable for the same harm." *Nerenhausen v. Chicago, M., St. P. & Pac. R. Co.*, 479 F.Supp. 750, 756 (D.Minn.1979), citing *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 371, 104 N.W.2d 843, 846–47 (1960), overruled on other grounds, *Tolbert v. Gerber Indus., Inc.*, supra. Moreover, unlike contribution, "[i]ndemnity does not require common liability, but arises out of a contractual relationship, either express or implied by law, which requires one party to reimburse the other entirely." *Hermeling v. Minnesota Fire & Cas. Co.*, supra at 273 n. 1.

Minnesota Courts recognize the right to indemnity among joint tortfeasors in four situations, only three of which depend upon an express contractual provision. *Hendrickson v. Minnesota Power & Light Co.*, supra at 373, 104 N.W.2d 843, modified by *Tolbert v. Gerber Indus., Inc.*, supra at 367. Therefore, absent an express contractual provision, indemnity is recognized:

1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged;

2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged; and

3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

*Tolbert v. Gerber Indus., Inc.*, supra at 367. According to J & D, each of the three theories of liability, which have been alleged in

the proposed Third–Party Complaint, falls within one of the foregoing categorizations.

Nevertheless, indemnification is "governed by judicial concepts of equity." *Allum v. MedCenter Health Care, Inc.*, 371 N.W.2d 557, 560 (Minn.App.1985), quoting *Olson v. Village of Babbitt*, 291 Minn. 105, 111, 189 N.W.2d 701, 706 (1971). As a consequence, indemnity "does not lend itself to hard-and-fast rules, and its application depends upon the particular facts of each case." *Zontelli & Sons v. City of Nashwauk*, 373 N.W.2d 744, 744 (Minn.1985). Indemnity is not permitted, however, where its application would contravene public policy. *Id.*, citing *Northern Pacific Railway Co. v. Thornton Bros. Co.*, 206 Minn. 193, 196, 288 N.W. 226, 227 (1939); *Independent School Dist. No. 877 v. Loberg Plumbing & Heating Co.*, 266 Minn. 426, 434, 123 N.W.2d 793, 799 (1963) (contract provisions that violate public policy are void).

Accordingly, we are to determine whether, under Minnesota law, public policy prohibits indemnification for civil penalties under the Clean Air Act. In making this determination, we address the underlying purposes of the Clean Air Act, and then we turn to those Minnesota decisions which have addressed the same, or similar, policy concerns in the context of indemnification.

The purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources." *Title 42 U.S.C. § 7401(b)(1)*. As a part of a strategy to protect the Nation's air quality, the Act requires the Administrator of the EPA to prescribe an emission standard for asbestos, which Congress has deemed to be a hazardous air pollutant. *Title 42 U.S.C. § 7412(d)*. To enforce compliance with these emission standards, Section 113 of the Act gives the Administrator of the EPA authority to commence a civil action to recover civil penalties whenever she finds that an owner or operator violates, or fails to comply with, any National Emission Standard for Hazardous Air Pollutant ("NESHAP") regulation. *Title 42 U.S.C. § 7413(b)*. Although the Clean Air

*& Stockbridge*, 876 F.2d 1101, 1106 (4th Cir. 1989).

Act is a civil and not a criminal statute, the penalties imposed pursuant to its authority "can be considered quasi-criminal." *U.S. v. Tzavah Urban Renewal Corp.*, 696 F.Supp. 1013, 1021 (D.N.J.1988).

■ The purpose of the asbestos NESHAP regulation, which is implicated in this case, "is to ensure that buildings containing asbestos are demolished in such a way as to minimize the release of asbestos dust into the air." *United States v. Geppert Bros., Inc.*, 638 F.Supp. 996, 1000 (E.D.Pa.1986). To achieve this purpose, the asbestos NESHAP imposes obligations on both the owner and the operator of the demolition project. For example, in *United States v. Geppert Bros.*, the EPA brought a civil action for violations of the Clean Air Act, which were generated by a demolition project, against both the demolition contractor and the owner of the building. The owner raised, as an affirmative defense, that it could not be liable for the violations because it had contracted with the operator to do the actual work involved in razing the structure. In rejecting this defense, the Court concluded that the regulations were intended to apply to both the owner of the building being razed, and the operator of the demolition project.

Under the Act, the term "owner or operator" is defined as any person "who owns, leases, operates, controls, or supervises the facility being demolished or renovated or any person who owns, leases, operates, controls or supervises the demolition or renovation, or both." *Title 40 C.F.R. § 61.141*.[8] As is clear, an organization that has control over an asbestos removal project qualifies as an "operator," as that term is used in the Statute. *Adair v. Troy State University of Montgomery*, 892 F.Supp. 1401, 1409 n. 9 (M.D.Ala. 1995).

In furthering the statutory purpose of improving the quality of the Nation's air, the Act, and the asbestos NESHAP, provide strict liability for civil violations. See, e.g., *United States v. B & W Inv. Properties*, 38 F.3d 362, 367 (7th Cir.1994) ("Having been deemed an owner or operator, [defendant] has no valid challenge against application of the Act, regardless of how minimal the company's responsibilities or knowledge might actually have been."), cert. denied, —— U.S. ——, 115 S.Ct. 1998, 131 L.Ed.2d 1000 (1995). In this respect, the legislative history, which accompanies the 1977 Amendments to the Clean Air Act, reflects Congress' rationale for establishing a strict liability scheme, as follows:

> "[W]here protection of the public health is the root purpose of a regulatory scheme (such as the Clean Air Act), persons who own or operate pollution sources in violation of such health regulations must be held strictly accountable. This rule of law was believed to be the only way to assure due care in the operation of any such source. Any other rule would make it in the owner or operator's interest not to have actual knowledge of the manner of operation of the source. Moreover, in the Committee's view, the public health is injured just as much by a violation due to negligence or inaction as it is by a violation due to intent to circumvent the law. Thus, the Committee believes that the remedial and deterrent purposes of the civil penalty would be better served by not limiting its application to 'knowing' violations."

*H.R.Rep. No. 94–1175, 94th Cong., 2d Sess. at 52 (1976).*

As demonstrated by the following Committee note, Congress recognized that the imposition of a civil penalty upon an 'unknowing' party might produce a harsh result, but reasoned that such a measure was necessary in order to advance the purposes of the Act:

---

8. For reasons that are not disclosed in the Record, the Government chose not to seek civil penalties against St. Paul, notwithstanding the City's status as the owner of the warehouse. Of course, there need not be a legal relationship between the plaintiff and the putative third-party defendant in order for the defendant to assert a proper impleader and, therefore, the fact that the Government chose not to seek civil penalties against St. Paul is largely irrelevant to our analysis. See, e.g., *Smithkline Beckman Corp. v. Pennex Products Co.*, 103 F.R.D. 539, 541 (E.D.Pa.1984) ("It is not relevant to the defendant's right to bring in a third-party defendant, that the plaintiff * * * declines to assert a claim against him."), quoting 3 J. Moore, *Moore's Federal Practice* ¶ 14.10 at 14–62.

" '[T]he Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will assure that violations will not occur.' "

*Id.* at 53–54, quoting *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). Without question, Congress intended to impose a strict, regulatory scheme in order to ensure compliance with the strictures of the Clean Air Act.

■■■ Given the importance that Congress has placed upon air quality—as reflected by the application of strict liability to offending owners and operators—we conclude that an operator's action for indemnification, so as to secure a proportionate share of a civil penalty against an owner, is not cognizable under Minnesota law. As we have noted, it is settled Minnesota law that indemnification will not be allowed if its application would violate public policy.

In *Zerby v. Warren,* 297 Minn. 134, 143, 210 N.W.2d 58, 64 (Minn.1973), the Minnesota Supreme Court considered the validity of a contractual indemnity provision in the context of a strict liability, statutory claim. There, in a wrongful death action, the seller of glue sought contractual indemnity from the manufacturer of the product. At issue was a Minnesota Statute that made the sale of intoxicating glue, to a minor, a violation of State law. In the Court's view, the legislature had concluded that, in the interest of the public welfare, minors should not be sold glue which contained specific harmful ingredients. In denying the seller's claim for indemnity, the Court reasoned that "[a]ny agreement which relieves the defendants of the consequences of the violation of the public policy imposed by [the statutory provision] is against public policy." *Id.* at 144, 210 N.W.2d 58. While the Court recognized that a party may contract so as to seek indemnity against its own negligent acts, a contract may not relieve a person from the discharge of an absolute duty that has been imposed by law for the protection of others. *Id.* at 143–44, 210 N.W.2d 58. As with the defendant in *Zerby,* J & D seeks indemnification in an effort to relieve itself from the consequences of having, purportedly, violated a statutory duty that had been imposed for the protection of others. See also, *Blair v. Anik Liquors,* 210 N.J.Super. 636, 645, 510 A.2d 314, 319 (1986) (indemnification for fines resulting from statutory violations violates public policy).

More recently, in *Hutt Consultants v. Const. Maintenance Systems, Inc.,* 526 N.W.2d 62, 65 (Minn.App.1995), the Minnesota Court of Appeals rejected a general contractor's contractual claim, for indemnification against a subcontractor, in order to recoup the benefits that the general contractor was ordered to pay in a workers' compensation proceeding, where the general contractor had violated its statutory duty to acquire workers' compensation insurance. In so ruling, the Court explained that, to allow "a general contractor to shift its workers' compensation expenses by means of an indemnification provision would contravene the public policy embodied in the Workers' Compensation Act of requiring employers to bear the burden of their employees' work-related injuries." *Id.* at 65. As the Court viewed the matter, since the legislature, as a matter of public policy, "had already decided who sh[ould] bear the risk of loss," the parties were not free to place that risk on someone else. *Id.* The Court also expressed concern that allowing indemnification might create an incentive for employers to forego the purchase of workers' compensation insurance that is required by State law. *Id.* Likewise, to permit indemnification in this instance would similarly undermine the policies fostered by the Clean Air Act, for Congress concluded that both "owners" and "operators" should be held responsible for ensuring compliance with the asbestos NESHAP. Moreover, allowing J & D to indemnify itself for any strict liability penalties, that should ultimately be imposed, could effectively remove any incentive on J & D's part to comply with the governing air quality regulations.

■■■ Our finding, that indemnification would contravene public policy, is strengthened by an analogy to the general rule, under Minnesota law, which bars the insurability of an award of punitive damages. "Because the punitive purpose of punitive

damages is lost when such damages are paid by another on the defendant's behalf, public policy is not served by permitting transfer of the responsibility for payment of punitive damages to another." *Rosenbloom v. Flygare*, 501 N.W.2d 597, 602 (Minn. 1993); see also, *Wojciak v. Northern Package Corp.*, 310 N.W.2d 675, 680 (Minn.1981). In recognition of the policy concerns relating to the insurability of punitive damages, the Minnesota Supreme Court, in *Perl v. St. Paul Fire and Marine Ins. Co.*, 345 N.W.2d 209, 215–16 (Minn.1984), denied an attorney's request to be reimbursed, at his insurer's expense, for the fees that he was required to forfeit as a result of his own misconduct. See also, *St. Paul Fire and Marine Ins. Co. v. Briggs*, 464 N.W.2d 535, 539 (Minn.App.1990) (holding that insurance coverage for nonpayment of taxes is contrary to public policy since corporate officers are under a legal obligation to ensure that corporate taxes are paid), rev. denied (Minn., March 15, 1991). These same policy concerns militate against J & D's request to be indemnified for any penalties that it should be assessed for violating the prohibitions of the Clean Air Act.

■■■ Also supportive of our conclusion, that Minnesota law provides J & D with no substantive basis for an indemnity claim against St. Paul, is the absence of any operative provision for contractual indemnity for J & D's own wrongdoing. In *Tolbert v. Gerber Indus., Inc.*, supra at 367, the Court rejected the previously recognized doctrine, which had permitted a claim for indemnity where the party seeking reimbursement had incurred liability because of its failure, even though negligent, to discover or prevent the misconduct of the one against whom reimbursement was being sought. After *Tolbert*, if a party is to seek indemnification for its own negligence, "there must be an express provision in the contract to indemnify the indemnitee for liability occasioned by its own negligence; such an obligation will not be found by implication." *Farmington Plumbing v. Fischer Sand and Aggregate, Inc.*, 281 N.W.2d 838, 842 (Minn.1979); see also, *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 53 (Minn.1983) ("There is no implied right of indemnity for one's own wrongful conduct."). According to the Court in *Farmington Plumbing*, the preclusion of an implied right of indemnity, for one's own wrongful conduct, "is consistent with the policy expressed in *Tolbert v. Gerber Indus., Inc.*, supra, that each tortfeasor accept responsibility for damages commensurate with its own relative culpability." *Id.* at 842.

Of course, in denying J & D's request to commence an indemnity claim against St. Paul, we assume, but without deciding, that the allegations of the proposed Third–Party Complaint are true. Nevertheless, even if J & D had relied upon St. Paul's representations and contractual obligations to its own detriment, the Clean Air Act places the responsibility on both "owners" and "operators" to ensure compliance with the Act. While we recognize that J & D does not request indemnification "for its own negligence," we conclude that the reasoning of the Minnesota Supreme Court, in *Tolbert v. Gerber Indus., Inc.*, supra at 367, applies to penalties for which the law imposes an absolute duty. As we have noted, in *Tolbert*, the Court concluded that, absent an express contractual provision, indemnity should not be permitted to shift an "entire loss from one culpable wrongdoer to another." *Id.* at 367.

Moreover, the conclusion we reach is consistent with the only case that addresses whether considerations of public policy will allow an "owner" or "operator" to indemnify itself, under State law theories of recovery, against the imposition of a civil penalty under the Clean Air Act. In *Beerman Realty Co. v. Alloyd Asbestos Abatement Co.*, 100 Ohio App.3d 270, 653 N.E.2d 1218 (1995), the Ohio Court of Appeals held that an owner could not, on common law grounds, seek indemnity for the penalties that were assessed under the Act. Relying upon the legislative history of the civil penalty provisions, the Court concluded that allowing indemnification would violate public policy, and would contravene the purposes of the Clean Air Act. *Id.* 653 N.E.2d at 1223. According to the Court, if the building owner could escape liability by merely contracting with another party for the removal of the asbestos, then the owner would have no incentive to act responsibly, in the disposal of an asbestos-laden building, by

choosing a dependable contractor, and by taking measures to adequately supervise the work. *Id.* at 1221. We find this reasoning to be persuasive. As we have related, to permit indemnification here would have the practical effect of removing any incentive, on J & D's part, to ensure compliance with the NESHAP regulations. Cf., *United States v. Tex-Tow, Inc.,* 589 F.2d 1310, 1314 (7th Cir.1978) (denying indemnification of civil penalties assessed under the Clean Water Act on the ground that "the party engaged in the potentially polluting enterprise is in the best position to estimate the risk of accidental pollution and plan accordingly"); *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 926 (S.D.N.Y.1977) (absence of defense, and the purposes of penalty provision, lead to the conclusion that there is no right to indemnity under the Clean Water Act), rev'd in part, aff'd. in part, 584 F.2d 1151 (2d Cir. 1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

In denying leave to amend, we do not overlook J & D's abundant concern that St. Paul is primarily and, perhaps, solely responsible for the alleged violations. Should this be the ultimate determination, however, J & D will not be prejudiced by this Order, for Section 113(e) of the Act, *Title 42 U.S.C. § 7413(e),* requires the Court, where appropriate, to consider a variety of specific criteria in assessing the amount of any civil penalty, based upon the defendant's unique circumstances. See, e.g., *United States v. Midwest Suspension and Brake,* 824 F.Supp. 713, 735 (E.D.Mich.1993), aff'd, 49 F.3d 1197 (6th Cir.1995); *United States v.*

*Harford Sands, Inc.,* 575 F.Supp. 733, 735 (D.Md.1983) (while not relevant to a determination of liability, defendant's lack of knowledge may affect its culpability and, therefore, the amount of a civil penalty which would be appropriate).

"[I]n addition to such other factors as justice may require," the Act requires the Court to consider the defendant's "good faith efforts to comply." *Title 42 U.S.C. § 7413(e)(1).* In this respect, the Government correctly notes that "the court can mitigate the impact of strict liability in cases where the evidence shows that a specific defendant is less culpable due to the actions of another person." *Government's Supplemental Memorandum,* at 6. Accordingly, to the extent that J & D believes that the actions taken by St. Paul are germane to the amount of penalty that J & D should be assessed, it may urge these same arguments to the Court irrespective of whether St. Paul has been joined as a third-party defendant. Further, if J & D's assertions as to the relative culpability of St. Paul are established, then the Government's election, to forego a joinder of St. Paul, will work no disadvantage to J & D, for J & D will pay no more in penalties than the amount that the Court determines that J & D should justly bear, and no more. If, as J & D urges, the failure to join St. Paul will foreclose an opportunity to obtain full recompense for a violation of the Clean Air Act, then the Government can bear the brunt of any public opprobrium should it have failed to effectively, and fairly, enforced the legislative policies which undergird the Clean Air Act.[9]

---

9. We recognize the existence of some authority which holds that the liability for a civil penalty, under the Clean Air Act, is joint and several. See, e.g., *United States v. B & W Inv. Properties, Inc.,* No. 91 C 5886, 1994 WL 53781 *5 (N.D.Ill., February 18, 1994) (affirming Magistrate Judge's recommendation that penalty under the Clean Air Act can be imposed jointly and severally), aff'd, 38 F.3d 362, 367 (7th Cir.1994). We need not reach that issue here, however, for the Government has opposed, for reasons unknown to this Court, the joinder of all of the alleged wrongdoers. Nevertheless, given our rejection of J & D's attempt to institute an indemnity claim against St. Paul, we would substantially doubt the propriety of holding J & D vicariously liable for the sole fault of St. Paul, under some notion of joint and several liability. Here again, however, we need not reach that issue for, applying its equitable powers to do what is just, the Court can assure that J & D will pay no more than its proper share of any total penalty, and the Government should not be heard to complain that St. Paul's wrongdoing, if any, has not been properly punished through a vicarious penalty against J & D. We are aware of no public policy that is fostered by the targeting of one of several potential wrongdoers to bear a penalty that should be equitably allocated on the basis of primary fault. If, as J & D urges, St. Paul has, with impunity, avoided its responsibilities under the Clean Air Act as a result of what J & D regards as the Government's indulgently noncritical eye, then the Court can assure that J & D will endure no prejudice, and the Government will bear, as it

Accordingly, we conclude that J & D has failed to show that there is an underlying substantive basis, under Minnesota law, upon which it may assert a third-party claim for indemnity against St. Paul.

NOW, THEREFORE, It is—

ORDERED:

That J & D's Motion for Leave to file a Third Party Complaint against St. Paul [Docket No. 10] is DENIED.

properly should, any warranted criticism should it have abandoned the national goal of an effective and nonpartisan enforcement of the Clean Air Act.