**UNION PACIFIC RAILROAD COMPANY, Plaintiff,**

v.

**REILLY INDUSTRIES, INC., Defendant.**

**No. CIV. 4–96–660 DSD/JMM.**

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 3, 1997.

Richard Ihrig, Sarah D. Halvorson, Steven D. Kelley, Lindquist & Vennum, Minneapolis, MN, for Plaintiff.

Becky A. Comstock, Alexandra B. Klass, Dorsey & Whitney, Minneapolis, MN, for Defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the cross motions of plaintiff and defendant for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated, the court denies plaintiff's motion, and grants in part and denies in part defendant's motion.

## BACKGROUND

Plaintiff Union Pacific Railroad Company ("Union Pacific") seeks injunctive and compensatory relief for past and future costs to clean up contamination resulting from the former creosoting operations of Republic Creosoting Company ("Republic"), the predecessor company of defendant Reilly Industries, Inc. ("Reilly").

Chicago Great Western Railway Company ("Great Western") owned approximately 23.8 acres of property located near the intersection of Fourth Street Southeast and Oak Street, in Minneapolis, Minnesota. From 1903 until approximately 1919, Great Western leased approximately five acres of the property ("the site") to Republic. Republic operated a wood creosoting treatment facility at the site. Republic treated wood products, such as paving blocks, railroad ties, and telephone poles, with creosote oil. Creosote is a distillate of coal or wood tar and consists of numerous aromatic hydrocarbons. In 1968, Great Western merged with the Chicago and North Western Railway Company ("CNW").

In 1987, the Minneapolis Community Development Agency ("MCDA") entered into an agreement with CNW to conduct tests on CNW's property to assess potential environmental concerns which could be associated with the purchase of the property. The MCDA was investigating the development of a University Transitway between the Minneapolis and St. Paul campuses of the University of Minnesota. An investigation was conducted and Barr Engineering issued a report entitled "Preliminary Investigation for Proposed Intercampus Transitway" ("Barr Report"). A copy of the Barr Report was sent to Virgil Steinhoff, Manager of Industrial Development at CNW. The Barr Report investigation included collection and analysis from two monitoring wells, two soil borings, and soil gas probes from thirteen locations on the property. In its summary and recommendations, the Barr Report states:

> Based on field and laboratory data, a general description of the site can be constructed. Site soils included sands and swamp deposits. Some of the soils were contaminated with wood treating oils. These soils may represent a source area for semi-volatile organic compound concentrations found in the groundwater. The

shallow groundwater beneath the site contains low levels of volatile organic compounds. A source area for volatile organic compound contamination of groundwater was not identified. The shallow groundwater in the vicinity of Well W2 also contains semi-volatile compounds at concentrations which exceed state drinking water criteria. The soil at Well W2 may be a source of the semi-volatile compounds reported in the sample collected from Well W2.

> If it is decided to move further on this site, we have several recommendations. First, additional work needs to be done to determine both the vertical and horizontal extent of groundwater contamination. At least, one additional shallow well on the upgradient edge of the property needs to be installed and sampled. This well will also be needed to more accurately define the direction of flow. . . .

> Additional soil work is needed to define the extent of contamination around Well 2 and look for other potential sources on the site. Initially, this work should be strictly reconnaissance type borings to make visual OVA determinations. Some samples should be analyzed to provide data necessary to investigate possible treatment technologies for the soil.

> Based on the preliminary data, comparisons can be made to similar sites in order to speculate on the need for and type of remedial action that might be required at the site. Excavation of contaminated soils will likely be required. . . .

Affidavit of Alexandra B. Klass, Ex. 13 at 9.

In 1990, the University of Minnesota negotiated with CNW to purchase the parcel of property. The University's proposed uses of the property were the construction of a new laboratory building, a hazardous waste management facility, a bus transitway, and parking lots. CNW retained Dahl & Associates, Inc. ("Dahl"), an environmental engineering firm, to investigate the environmental condition of the property. Dahl researched the historical ownership and uses of the property to determine whether any past uses of the property may have impacted the condition of the property. Dahl obtained a 1912 map of the area which depicted the Republic creo-

soting facility on the northeast portion of the property. Dahl then conducted a limited sub-surface investigation consisting of five borings in the area of the former Republic plant, ten borings throughout the remainder of the CNW property, and an analysis of soil and groundwater samples collected from the borings. The results of Dahl's historical and sub-surface investigations were set forth in a "Phase I and Phase II Property Evaluation," dated June 18, 1990. Analysis of the soil and groundwater samples indicated the presence of polynuclear aromatic hydrocarbons ("PAHs"), which are constituents of creosote. Dahl reviewed the Barr Report as part of its investigation. Well 2 from the Barr Report is approximately 400 feet west of the Republic site.

Following the results of the June 18, 1990 evaluation, Dahl conducted a further investigation to determine the nature and extent of the soil and groundwater creosote contamination. In July 1990, Dahl drilled twelve borings on the Republic site and analyzed samples from the borings. The results of this investigation were included in Dahl's "Phase II Property Evaluation," dated August 1, 1990. Semi-volatile organic compounds ("SVOCs") were detected in the vicinity of the former creosoting facility. The report defined the extent of the contamination:

> Soils with creosote odors and containing SVOCs generally associated with creosote were found in the area where storage tanks and settling basins for creosote sludge were formerly located. Soil contamination is found within the depth interval 3–6 feet below ground surface, and the total volume of contaminated soils and overburden is estimated to be not less than 1500 cubic yards.

> Groundwater in the vicinity of the former creosoting plant, and to the south and southwest of the plant in the direction of groundwater flow, was found to be contaminated with SVOCs generally associated with creosote above the [recommended allowable limits] for carcinogenic and non-carcinogenic SVOCs. The apparent source of the groundwater contamination is creosote-containing soils associated with the former creosoting plant. W2, which was found to contain SVOCs above the [recommended allowable limits], is the furthest

down-gradient sampling point for groundwater contamination. The extent of groundwater contamination in this direction is unknown.

Affidavit of Rodney M. Jasmer, Exh. 4 at UP 13671. The report recommended that CNW notify the Minnesota Pollution Control Agency of the creosote contamination at the site. CNW reported the creosote contamination and enrolled the Republic site in the Minnesota Pollution Control Agency's Voluntary Investigation and Cleanup ("VIC") Program.

In July 1990, CNW and the University finalized the purchase agreement for the property. As part of the sale, CNW agreed to remediate the contaminated premises. The agreement gave CNW access to the property for three years in which to complete the remediation. In October 1990, CNW sold the property to the University of Minnesota. By letter dated August 17, 1990, CNW informed Robert Polack, General Counsel for Reilly, of the results of Dahl's investigation.

CNW directed Dahl to identify and evaluate the options for remediation of the contaminated soil on the Republic site. Dahl initially concluded that the most appropriate remedy was bioremediation. In September 1990, the MPCA preliminarily agreed to bioremediation. A second evaluation was undertaken by Dahl in order to confirm its earlier conclusion that bioremediation was the most appropriate remedy. Bioremediation could remediate the soil to a cleanup level of approximately 1500 parts per million ("ppm") PAH. In February 1993, Dahl submitted a Remedial Action Workplan for bioremediation. In October 1993, the MPCA stated it would accept a cleanup level of 10 to 100 ppm PAH. A third evaluation was necessary due to the MPCA's decision to impose a more strict cleanup goal. Dahl evaluated remedial alternatives, including augmented bioremediation, thermal desorption, incineration, and landfilling. Dahl concluded that only thermal desorption and landfilling were viable alternatives.

In April 1994, CNW and Dahl determined that thermal desorption was the most appropriate remedial action. They selected Advanced Soil Technologies, Inc. ("AST") to conduct the thermal desorption process at

the site. In May 1994, the MPCA established a cleanup goal of 10 ppm PAH at the site.

On August 1, 1994, the first of two public meetings was held with respect to the Republic site. Prior to the meeting, the MPCA sent a notice to over 4,000 persons, including residents in the area around the site. The notice stated: "You're Invited! Community Meeting on Cleanup Actions Planned for the Hwy. 280 Industrial Corridor." The notice described the cleanup endeavors:

> In 1992, the Minnesota Pollution Control Agency (MPCA) presented information to neighborhood residents about several environmental contamination sites in the Hwy. 280 Industrial Corridor. While these sites don't pose significant risk to public health or drinking water supplies, local citizens have expressed concern about the sites' effects on the environment and the local economy.
>
> This summer and fall, cleanup actions are planned for three sites: the Archer Daniels Midland Site, Chicago–Northwestern (Republic Creosote) Site, and Valentine–Clark. The MPCA wants to update the Como, Prospect Park, and St. Anthony Park neighborhoods and the Midway Chamber of Commerce members on progress made at additional sites. The MPCA invites you to a community meeting to learn about the cleanup plans.... A fact sheet describing all of the sites will be available at the meeting. On the back of this invitation is a generalized map defining the sites that MPCA will discuss.

Affidavit of Rodney M. Jasmer, Ex. 42 at 16771–72. The map included a reference to the Republic Creosote site.

The fact sheet that was distributed at the August meeting described the cleanup at the site:

> Redevelopment possibilities for the site include residences, so cleanup standards must meet residential standards. Chicago–Northwestern conducted studies to find the best cleanup solution for the site. Biological treatment options were tried, but none of the available technologies met the required cleanup levels or could be completed within the company's time frame.
>
> Landfill options were examined, but were not considered feasible because of the high concentrations of PAHs. Removal of all the wastes to a secure, hazardous waste containment facility was not cost effective. Re-use of soil in construction materials was not possible because of the high level of carcinogenic PAHs.
>
> The only remedy that results in complete destruction of PAHs in a reasonable amount of time is high-temperature thermal desor[p]tion. ...
>
> Continuous air emissions monitoring will be conducted to ensure that levels of gases such as carbon monoxide and acid are kept well below health standards. Soil tests show that no chlorinated compounds are present and the natural sulfur content of the soil is very low. These elements are important because heating chlorinated compounds can cause formation of dioxin and heating sulfur can create acids. Only soil from the site will be treated, and it will take approximately two weeks to complete the job.

Affidavit of Rodney M. Jasmer, Ex. 43 at Dahl 14917.

At the public meeting, a representative from the MPCA informed the public that they had considered bioremediation, but that bioremediation would take too long. Reuse of the material in asphalt was also considered, but the material had a high concentration of PAHs. The representative also discussed landfilling as a considered alternative. The representative informed the public that the chosen alternative was thermal desorption and described the process.

On October 25, 1994, Dahl submitted a Remedial Action Workplan for thermal desorption of the site. The MPCA verbally approved the plan on November 14, 1994. The excavation of the soil at the site began on November 16, 1994, and continued through December 16, 1994. On November 30, 1994, the second public meeting was held. The public notice stated: "Community Meeting and Request for Comments on Cleanup Action Planned for the Former Chicago and North Western Property." The notice provided the following:

> In August 1994, the Minnesota Pollution Control Agency held a community meeting on several cleanup actions planned for the

Highway 280 Industrial Corridor including the cleanup action to take place at the former Chicago and North Western (C & NW) Southeast Minneapolis Yard located between 17th and 25th Avenues SE and 4th Street SE and the Burlington Northern Railroad property, Minneapolis, Minnesota.

The purpose of this follow-up meeting is to discuss and receive comments on the specifics of the cleanup action proposed for the former C & NW property. A member of the Minnesota Pollution Control Agency and the consultant who will conduct the cleanup will be available at the meeting to answer questions.

A Remedial Action Workplan (Workplan) has been submitted to the Minnesota Pollution Control Agency. The full administrative record on this site and the Workplan is available for review at the Minnesota Pollution Control Agency.... Please provide any written comments on the Workplan ... by December 1, 1994.

Affidavit of Rodney M. Jasmer, Ex. 47 at Dahl 106708.

At the public meeting, the thermal desorption process was explained. In response to a question, the Dahl representative explained that the plan for thermal absorption had been submitted to the MPCA and that there had been verbal approval of the plan. A representative with AST explained that the majority of the excavation of the soil had already been completed. The public was informed that the comments on the cleanup action were closed after 10:00 a.m. on December 1, 1994. Affidavit of Rodney M. Jasmer, Ex. 49 at UP 10134.

Thermal treatment of the soil occurred from December 28, 1994, until January 27, 1995. On January 13, 1995, the MPCA gave written approval of the thermal treatment remedy. The MPCA approved back filling of the treated soil on February 7, 1995. On March 30, 1995, Dahl submitted a Remedial Action Implementation Report which documented the remedial action. On May 4, 1995, the MPCA confirmed that the revised cleanup goal had been achieved. On September 18, 1995, the MPCA approved the Remedial Action Implementation Report.

In February 1995, CNW informed Reilly of the costs incurred in the remediation of the site. The total costs incurred by CNW are $1,025,518, excluding attorneys' fees and interest. Reilly has not reimbursed CNW for any costs. In 1995, Union Pacific acquired CNW. On December 22, 1995, Union Pacific commenced this action.

Union Pacific moves for summary judgment on its claims under CERCLA §§ 9607 and 9613, MERLA, nuisance, trespass, negligence, strict liability, and waste. Reilly moves for summary judgment on all of Union Pacific's claims. Reilly argues that Union Pacific is barred from recovering its cleanup costs under CERCLA because it failed to comply with the requirements of the National Contingency Plan. Reilly asserts that Union Pacific is limited to a contribution claim and that the contribution claim is barred by the doctrine of laches. Reilly contends that Union Pacific's state law claims are barred by statutes of limitations and laches.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A fact is material only when its resolution affects the outcome of the case. *Id.* at 248, 106 S.Ct. at 2510. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id. at 252, 106 S.Ct. at 2512. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

On a motion for summary judgment, the court views the evidence in favor of the non-

moving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue that facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court addresses the cross motions for summary judgment.

## A. CERCLA

To recover its response costs under CERCLA, a party must show that the defendant is a "responsible person"; that a "release" or threatened release from a facility has occurred; that the plaintiff incurred response costs as a result; and that the costs were necessary and consistent with the National Contingency Plan ("NCP"). *See* 42 U.S.C. 9607(a)(4)(A); *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934 (8th Cir. 1995); *see also County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1516–17 (10th Cir.1991) (requiring compliance with NCP for both cost recovery under section 9607(a) and contribution under section 9613(f)); *Boeing Co. v. Cascade Corp.*, 920 F.Supp. 1121, 1135 (D.Or.1996) (requiring showing of compliance with NCP for either cost recovery or contribution). Reilly asserts that Union Pacific failed to comply with the NCP in conducting its remedial action and, thus, is barred from recovering any costs from Reilly.

■ The parties agree that in order for Union Pacific to recover response costs, Union Pacific's remedial action must be consistent with the NCP, which is a set of regulations promulgated by the EPA to "establish criteria and provide guidance for site evaluation and cost effectiveness, planning of cleanup actions, and consideration of alternative remedial options."[1] *See Pierson Sand & Gravel, Inc. v. Pierson Township*, 851 F.Supp. 850, 855–56 (W.D.Mich.1994), *aff'd*, 89 F.3d 835 (6th Cir.1996); *see also* 42 U.S.C. § 9605 (recognizing the EPA as the agency to establish procedures and standards). A private party's response costs are considered consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements ... and results in a CERCLA-quality cleanup." See 40 C.F.R. § 300.700(c)(3)(I) The "substantial compliance" language was added by the EPA in 1990. See 55 Fed.Reg. 8666, 8792–94 (March 8, 1990). Prior to 1990, courts were in dispute about whether strict compliance or substantial compliance with the NCP was required of persons seeking to recover response costs. *See County Line*, 933 F.2d at 1513–14 (recognizing the EPA's revision with respect to the standard for determining a private party's consistency with the NCP); *VME Americas Inc. v. Hein–Werner Corp.*, 946 F.Supp. 683, 689

---

**1.** There is no dispute that this action is a remedial action, as opposed to a removal action. Remedial actions are subject to a much higher degree of regulation than that required of removal actions. *See Sherwin–Williams Co. v. City of Hamtramck*, 840 F.Supp. 470, 475 (E.D.Mich. 1993); *see also* 42 U.S.C. § 9601(23) (defining removal actions as "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release"); 42 U.S.C. § 9601(24) (defining remedial actions as "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of a hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare of the environment....").

(E.D.Wis.1996) (recognizing that the substantial revision of the regulations in 1990 was accompanied by a different standard which required "substantial compliance" instead of "strict compliance"); *but see N.L. Indus. v. Kaplan,* 792 F.2d 896, 898–99 (9th Cir.1986) (stating, even prior to 1990, that strict compliance was not required). A response action will not be considered "not consistent with the NCP" based upon "immaterial or insubstantial deviations" from the NCP. 40 C.F.R. § 300.700(c)(4).

■ The federal regulations direct that "private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action...." 40 C.F.R. § 300.700(c)(6). *See Sherwin–Williams Co. v. City of Hamtramck,* 840 F.Supp. 470, 477 (E.D.Mich.1993). Courts have " 'consistently held that failure to provide public comment opportunity renders remedial action inconsistent with the NCP and bars recovery of costs.' " *See C & C Millwright Maintenance v. Town of Greeneville,* 946 F.Supp. 555, 559 (E.D.Tenn.1996) (quoting *Pierson Sand & Gravel, Inc. v. Pierson Township,* 851 F.Supp. 850, 856 (W.D.Mich.1994), *aff'd,* 89 F.3d 835 (6th Cir.1996)); *see also VME Americas,* 946 F.Supp. at 690–91 (observing that it was undisputed that the plaintiff did not provide an opportunity for public comment, inform the community of the actions taken, respond to community inquiries, or provide the community with information). The failure to provide public comment constitutes a "substantial and material departure from the NCP." *VME Americas,* 946 F.Supp. at 690.

■ Union Pacific claims that it has met the substantial compliance requirement of the NCP because it has complied with all of the requirements of the VIC Program. As recognized in *VME Americas,* "some courts have found state regulatory involvement to be an effective substitute for public comment ... but only where the state agency 'is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance....' " *VME Americas,* 946 F.Supp. at 692 (quoting *American Color & Chemical Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945, 956–57 (D.S.C.1995)). Plaintiff asserts that CNW

and Dahl received input and approval from MPCA at every stage and that the MPCA's approval demonstrates that CNW's remedial action met all of the requirements of the VIC Program. As such, plaintiff argues, CNW's remedial action resulted in a CERCLA-quality cleanup and substantially complied with the NCP. However, the *VME Americas* court also recognized that most courts have rejected the argument that contacts with a state agency constitute a substitute for public participation:

> As stated in *Sherwin–Williams,* public comment means public comment:
>
> "The court finds, however, that state regulatory involvement in the remedial process is not a substitute for the public comment contemplated by section 300.700(c)(6). Public comment means just that, public comment. Negotiations between the [plaintiff] and [state] officials do not constitute the public comment contemplated by the CERCLA regulations....
>
> "The regulations clearly contemplate participation by the general public in decisions that could affect the environmental conditions of their neighborhood. Using state regulators as a substitute for the 'public' is contrary to the letter and the spirit of the regulations."

*VME Americas,* 946 F.Supp. at 692 (quoting *Sherwin–Williams,* 840 F.Supp. at 477).

The preamble to the 1990 NCP addresses the importance of the public comment requirement:

> Public participation is an important component of a CERCLA-quality cleanup, and of consistency with the NCP. The public—both [potentially responsible parties] and concerned citizens—have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups—which are performed without governmental supervision—are carried out in an environmentally sound manner. Thus, EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA.

*See* 55 Fed.Reg. 8795 (March 8, 1990); *see also VME Americas,* 946 F.Supp. at 691 (citing to agency's emphasis of the public

comment requirement). Notwithstanding the MPCA's involvement in the response efforts, it is not a substitute for CERCLA's public comment requirement.

Reilly argues that the two public meetings held in this case do not approach the meaningful public participation required for substantial compliance with the NCP. Reilly asserts that the first meeting merely provided information to neighborhood residents about several contaminated properties in the Highway 280 industrial corridor, including the Republic site. Reilly states that the meeting was limited in that an MPCA representative provided a history and description of the site, the nature of the contamination, and a discussion of why Union Pacific decided to proceed with the thermal treatment remedy. Reilly asserts that the second public meeting was held far too late in the remedy selection process to solicit any meaningful public comment. Reilly argues that the public "can hardly participate meaningfully in the remedy selection process when the remedy has already been selected, approved and partially completed." Defendant's Memorandum in Support of Motion for Summary Judgment at 15.

Plaintiff disputes Reilly's characterization of the second public meeting. Union Pacific asserts:

> While MPCA orally indicated it would approve the Workplan on November 14, 1994, it did not formally approve the Workplan until January 13, 1995. If substantial objection to the proposed remedy had been made at the November 30 meeting, MPCA was free to reject the remedy. Also, implementation of the thermal desorption remedy did not begin until December 28, 1994, well after the November 30 meeting and six days after the public comment period closed. While excavation of the soil began on November 16, soil excavation is not part of the remedy. If MPCA had required that the soil be landfilled, rather than thermally treated, as Reilly suggests, excavation of the soil would still have been necessary.

Union Pacific's Memorandum in Support of Summary Judgment at 18 n. 13.

In this case, CNW concentrated on thermal desorption as the appropriate remedial action by the time that public meetings were conducted. In *Louisiana–Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994), *cert. denied*, 513 U.S. 1103, 115 S.Ct. 780, 130 L.Ed.2d 674 (1995), the Ninth Circuit affirmed the district court's estimation that "there is nothing wrong with focusing on what appears to be the best remedy early on, so long as you don't make the decision until the time for decision." However, in order for public comment to be meaningful, the final decision must be open for discussion among remedial alternatives. *See Pierson Sand & Gravel, Inc. v. Pierson Tp.*, 851 F.Supp. 850, 856–57 (W.D.Mich.1994). Otherwise, the need for public comment would be purely academic. *See id.*

In *State of Minnesota v. Kalman W. Abrams Metals, Inc., et al.*, Civ. No. 4–96–CV–5, slip op. at 7–9 (D.Minn. August 22, 1997), the Honorable James M. Rosenbaum determined that the plaintiff failed to satisfy the requirements of the NCP by contracting for an experimental remediation plan prior to the end of the public comment period. Similarly, in this case, CNW contracted with AST to conduct the thermal desorption process even before the second public meeting was held. The excavation was also well underway by the time that the public comment period ended. In addition, when faced with questions regarding the odor and hazards associated with the remedy, Dahl admitted that a final remedial action plan for the thermal desorption remedy had been submitted and verbally approved by the MPCA, and that the majority of excavation at the site had been completed. Based on a review of the record, the public was informed of the selection without a reasonable opportunity for discussion. Contrary to plaintiff's assertions, this record does not support a determination that the remedial alternatives were a subject for any meaningful public debate. Thus, on the basis of plaintiff's failure to provide for public comment, Union Pacific is not in substantial compliance of the NCP.

 The NCP also requires that a remedial investigation and feasibility study be conducted. Even though the lack of public comment alone makes summary judgment appropriate, the court also finds that CNW did not satisfy the standards required by the

NCP with respect to a remedial investigation and feasibility study ("RI/FS"). The federal regulations provide for remedial site evaluation, remedial investigation, and analysis of remedial alternatives. *See* 40 C.F.R. § 300.700(c)(5)(vii)-(viii). Substantial compliance with the detailed provisions of section 300.430 is required in order to satisfy the requirement:

> Section 300.700(c)(5)(viii) directs private parties to compile a remedial investigation/feasibility study ("RI/FS") before conducting a cleanup. The RI/FS process requires an analysis of the initial threat of the contamination to health, welfare, and the environment. *Id.* § 300.430(d)(1). The investigation must also take into account fifteen factors ranging from hydrogeological concerns to contaminate mobility in deciding the type of remedial action to be taken. *Id.* § 300.430(d)(2)(I)-(vii).
>
> The feasibility part of the RI/FS process involves a detailed analysis of possible remedial alternatives. *Id.* § 300.430(e). The alternatives must undergo a detailed evaluation against a set of criteria. *Id.* § 300.430(e)(9)(iii)(A)-(I). After evaluation, the RI/FS eliminates, with explanation, those alternatives that are not the most "cost-effective" or that are not "protective of human health" and the environment. . . .

*See Sherwin–Williams,* 840 F.Supp. at 478. The failure to perform the RI/FS defeats a claim of substantial compliance with the NCP. *Id.*

Reilly argues that UP failed to prepare an RI/FS for either the bioremediation or the thermal treatment remedy. Reilly asserts that neither the Remedial Action Workplan nor the Remedial Action Implementation Report contain any discussion of the RI/FS criteria or provide a detailed analysis of remedial alternatives, the threat to public health or the environment, or the cost effectiveness of the thermal desorption remedy. Based upon a review of the record, this court agrees. Although Union Pacific submits notes and internal memoranda in support of its position that it satisfied the RI/FS requirement, the notes and memoranda are not a substitute for the detailed provisions of the federal regulations. In this case, it is apparent from the record that CNW's voluntary response action was dictated by the purchase agreement. Although CNW's efforts are commendable, "Congress chose . . . to create a detailed regulatory scheme and decided to make 'adherence to the regulatory scheme . . . more important than making CERCLA an unlimited vehicle for cleanup cost recovery.'" *VME Americas,* 946 F.Supp. at 692–93 (quoting *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.,* 748 F.Supp. 373, 385 (E.D.N.C.1990); recognizing that voluntary plaintiff would be frustrated by the result; and noting that plaintiff's state law claims remain viable notwithstanding summary judgment on the CERCLA claim).

**B. Supplemental Jurisdiction**

 This court's jurisdiction was based upon the federal question presented by CERCLA. *See* 28 U.S.C. § 1331; 42 U.S.C. §§ 9607 and 9613. With federal question jurisdiction, this court has supplemental jurisdiction to consider and adjudicate plaintiff's state law statutory and common law claims. *See* 28 U.S.C. § 1367. Although 28 U.S.C. § 1367 affirmatively grants the court authority to exercise jurisdiction over state law claims, a federal court may decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. S 1367(c)(3); *see also Moubry v. Independent Sch. Dist. No. 696,* 951 F.Supp. 867, 889 (D.Minn.1996). It is within the court's discretion to retain supplemental jurisdiction over plaintiff's state law claims after dismissal of the federal claims. *Kansas Public Employees Retirement System v. Reimer & Koger Assoc., Inc.,* 77 F.3d 1063, 1068 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 359, 136 L.Ed.2d 250 (1996). Because summary judgment is appropriate on the federal claims, the court will exercise its discretion and dismiss the remaining state law claims without prejudice.

**CONCLUSION**

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment is denied (Doc. No. 40);

2. Defendant's motion for summary judgment is granted with respect to counts I and II, the CERCLA claims. Counts I and II are dismissed with prejudice. Defendant's motion is denied in all other respects (Doc. No. 40);

3. Counts III through XI, plaintiff's state law claims, are dismissed without prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**