# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3545

_____

| | | |
|---|---|---|
| State of Minnesota, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Kalman W. Abrams Metals, Inc.; | * | |
| Blum Holdings, Inc.; A & D Recycling, | * | |
| Inc.; Martin Bush Iron & Metal | * | Appeal from the United States |
| Company; Metalsmith Recycling Co., | * | District Court for the |
| | * | District of Minnesota. |
| Defendants - Appellees, | * | |
| | * | |
| Kirschbaum-Krupp Metal Co.; Leder | * | |
| Brothers Company, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: June 11, 1998
Filed: September 17, 1998

_____

Before BOWMAN, Chief Judge, HEANEY and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

The State of Minnesota has sued to recover costs incurred by the Minnesota Pollution Control Agency (MPCA) in cleaning up lead-contaminated soils. The

defendants are present and former owners of companies that furnished scrap wire to the site's proprietor for an environmentally unsound recycling process. The State asserts claims under the federal "superfund" law, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-75, and its state law counterpart, the Minnesota Environmental Response and Liability Act (MERLA), Minn. Stat. §§115B.01-.24. The State appeals the grant of summary judgment in favor of non-settling defendants. We agree that the State's claims must in large part be rejected because MPCA conducted the cleanup in an arbitrary and capricious manner. But we conclude the State may recover from responsible private parties for the non-arbitrary portion of response costs that ultimately produced a successful environmental remedy. Accordingly, we reverse in part and remand.

## I.  Background.

For over ten years, Gerald McGuire obtained used insulated wire from Twin Cities scrap dealers, burned insulation off the wire on his residential property in Mora, Minnesota, and returned or resold clean wire to the scrap dealers. McGuire was paid based on the weight of insulation burned off. The burning process generated ash, which McGuire spread over portions of his property. He also may have conducted smelting activities generating slag that he deposited on the premises. In April 1985, MPCA obtained a search warrant and inspected the McGuire property. When a preliminary soil analysis revealed hazardous lead concentrations, McGuire ceased his burning operations but advised MPCA that he could not afford to clean up the site. The agency placed the site on its Permanent List of Priorities under MERLA. See Minn. Stat. § 115B.17, subd. 13.

In June, 1986, the United States Environmental Protection Agency (EPA) conducted a Site Assessment at MPCA's request. Soil analyses revealed hazardous concentrations of lead and elevated concentrations of other metals that posed "an imminent and substantial threat to human health and the environment," particularly to

McGuire's young children and grandchildren who often played on the site. MPCA designated the site as a "Class C" priority but took no action until March 1989, when it sent McGuire a formal Request for Information (RFI) asking him to identify suppliers of the insulated wire he had burned.[1] The agency then sent RFIs to the scrap dealers who eventually became defendants. Sam Blum denied knowledge of dealing with McGuire. The others admitted having McGuire burn insulation off used wire for them, and one admitted furnishing lead cable for burning. One denied responsibility for any release or threatened release of hazardous substances, while the others simply answered the RFI questions and denied knowledge of any such releases.

On August 28, 1990, MPCA issued a Request for Response Action (RFRA) formally asking McGuire to remedy the releases and threatened releases of hazardous substances at his property, and notifying him that, if he failed to do so, the agency could commence an action to compel performance or complete the requested actions and seek reimbursement from him.[2] At the same time, the agency determined that he would not comply based upon his prior representations of poverty and authorized the expenditure of $350,000 from the superfund to clean up the site. At the agency Board meeting approving these actions, MPCA staff advised its Commissioners that no RFRAs should be issued to the scrap dealers because their liability was not entirely clear.

---

[1]The RFI is an informal data-gathering administrative procedure. It is described by MPCA as "one of the first steps taken by the MPCA to comply with" MERLA by helping the agency identify private parties who may be "Responsible Persons" -- those who are liable under MERLA because their wastes or waste disposal practices have contributed to the release or threatened release of hazardous substances.

[2]The RFRA is the administrative procedure adopted by MPCA to comply with Minn. Stat. § 115B.17, subd. 1(a)(1), (3), the MERLA provision requiring that, before spending state superfund monies, MPCA "shall" (i) request "any responsible party known to the agency" to take reasonable and necessary remedial action, and (ii) determine that the actions requested will not be taken "by any known responsible party."

In January 1991, MPCA selected Delta Environmental Consultants to investigate the site and supervise the contractor hired to complete the selected remedy. MPCA later contracted with Microbial Biotechnology, Inc. (MBI), to perform on-site lead extraction using a treatment method known as soil washing. The agency announced to the public that the "whole cleanup process . . . will cost approximately $200,000" and distributed news releases advising this would be its first on-site attempt to extract lead from contaminated soil. It held a public meeting on June 27, 1991, at a local sportsmen's club to apprise the community of its decision.

After the cleanup began, MBI discovered that 1500 cubic yards of soil were contaminated, rather than 500 cubic yards, prompting MPCA to authorize spending an additional $350,000. Despite this additional funding, the MBI cleanup was a failure. Mechanical problems plagued MBI's equipment, and actual soil conditions were not conducive to soil washing. MBI failed to respond to MPCA complaints and finally quit the job in November 1991. MPCA terminated MBI's contract after spending $195,301.57 on this phase of the cleanup effort. MPCA next paid $25,000 to Cognis, Inc., a California firm, to test a different on-site soil treatment process. Cognis reported that it could not meet MPCA's rigorous lead treatment goal. MPCA then abandoned on-site remediation and, after a final bid process, hired Remediation Services, Inc. (RSI), to perform on-site stabilization of the soil followed by off-site disposal. RSI successfully completed the task in one month at a cost of $293,621.79. No further cleanup work is anticipated, and the site has been removed from the State's Permanent List of Priorities.

MPCA incurred a total of $660,384.82 in response costs to clean up the McGuire site. In January 1996, the State commenced this action to recover all response costs from the scrap dealers. Defendants are Kalman W. Abrams Metals, Inc. (KWA); two companies allegedly responsible for the actions of Martin Bush Iron & Metal Company (Martin Bush); Blum Holdings, the former owner of Sam Blum Iron

& Metal Company (Blum Holdings); A & D Recycling, Inc., the present owner of Sam Blum Iron & Metal (A & D Recycling); and two companies allegedly responsible for the actions of Leder Brothers Scrap Iron & Metal Company (Leder Brothers).

The district court issued four orders disposing of the State's claims. First, it granted summary judgment in favor of Blum Holdings on the ground that the State did not initiate legal or administrative proceedings before that corporation dissolved. The State appeals that ruling, which will be the last issue addressed in this opinion. Second, the court issued two orders granting summary judgment on the merits in favor of KWA, Martin Bush, and A & D Recycling. The court dismissed the State's CERCLA claims on the ground that MPCA is not entitled to reimbursement because it acted arbitrarily and capriciously in selecting a soil treatment plan and in failing to properly notify defendants of its proposed response action. The court dismissed the State's MERLA claims as time-barred by the six-year statute of limitations in Minn. Stat. § 115B.11. The State appeals these rulings, which are the principal focus of this opinion. Finally, after the State filed its notice of appeal, the district court entered a consent decree as to Leder Brothers reflecting a prior settlement. Appellees rely on the timing of this decree as one basis for their motion to dismiss the State's appeal for lack of jurisdiction, the issue we will next address.

## II. Appellate Jurisdiction.

Appellees move to dismiss the appeal, arguing we lack jurisdiction because the district court orders being appealed did not resolve claims against Leder Brothers and did not resolve pending claims among the defendants. The motion is denied.

In the district court, all the defendants initially moved for summary judgment. The State notified the district court in July 1997 that it had settled with Leder Brothers. The three orders being appealed resolved all the State's claims against the four non-settling defendants -- Blum Holdings in August 1996, KWA and Martin Bush in August

1997, and A & D Recycling on September 15, 1997. The court's August 1997 summary judgment order noted that Leder Brothers "originally joined in this motion, but have since settled with the plaintiffs." The settlement was not final in August 1997 because MPCA was awaiting public comments on the proposed consent decree. The State filed its notice of appeal on September 19, four days after the order entering summary judgment in favor of A & D Recycling.

"No statute or rule specifies the essential elements of a final judgment"; what is required is "some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as the court is concerned, is the end of the case." Goodwin v. United States, 67 F.3d 149, 151 (8th Cir. 1995). When it dismissed all claims against the last three non-settling defendants, the district court understood that Leder Brothers had settled and therefore its last two summary judgment rulings need not include those parties. Although the consent decree was not entered until October, final approval of the settlement was the kind of "ministerial task" that does not defeat finality, like calculation of the tax refund in Goodwin, 67 F.3d at 151. The court's August and September orders granting summary judgment contain the requisite "clear and unequivocal manifestation" of the court's belief that it had ended the case. Therefore, the three summary judgment orders became final and appealable on September 15, 1997.

Defendants' cross claims, counterclaims, and third-party claims were contingent upon defendants being liable to the State. Not surprisingly, therefore, the district court did not address those claims when it granted summary judgment in favor of the non-settling defendants. This did not affect the finality of the court's last summary judgment order or our jurisdiction. If appellees were aggrieved by the court's failure to address their contingent claims, they should have cross appealed.

### III. The State's CERCLA Claims.

CERCLA provides that responsible persons are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan [NCP]." 42 U.S.C. § 9607(a)(1)-(4)(A). If the State establishes that it incurred response costs to remedy a release or threatened release of hazardous substances from a facility, and that defendants are responsible persons, then defendants have the burden of proving that the costs incurred were inconsistent with the NCP, an issue that is judicially reviewed under the arbitrary and capricious standard of review for agency action. See 42 U.S.C. § 9613(j)(2); United States v. Northeastern Pharm. & Chem. Co. ("NEPACCO"), 810 F.2d 726, 747-48 (8th Cir. 1986), cert. denied, 484 U.S. 848 (1987), followed in Washington State Dept. of Transp. v. Washington Natural Gas Co., 59 F.3d 793, 802 (9th Cir. 1995), and United States v. Hardage, 982 F.2d 1436, 1442 (10th Cir. 1992), cert. denied sub nom. Advance Chem. Co. v. United States, 510 U.S. 913 (1993). "Congress has not provided that private parties must pay for the consequences of arbitrary and capricious agency action." Matter of Bell Petroleum Servs., Inc., 3 F.3d 889, 905 (5th Cir. 1993).

This appeal turns on whether MPCA incurred costs inconsistent with the NCP. The NCP is a set of EPA regulations that "establish[es] procedures and standards for responding to releases of hazardous substances." County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1511 (10th Cir. 1991). "The NCP is designed to make the party seeking response costs choose a cost-effective course of action to protect the public health and the environment." Washington DOT, 59 F.3d at 802. For the purpose of reviewing the grant of summary judgment on this issue, we assume without deciding that appellees are responsible persons, that the McGuire site was a "facility," and that MPCA incurred response costs to remedy the release of hazardous substances at that facility. Thus, the only question is whether MPCA remedied the environmental problem in an arbitrary and capricious manner.

There is a threshold problem in evaluating state agency cleanup action for consistency with the NCP. The EPA regulations distinguish between removal actions -- those taken to counter imminent and substantial threats to public health and welfare -- and remedial actions, which are longer term, more permanent responses. The NCP prescribes more detailed procedures and standards for remedial actions. Compare 40 C.F.R. §§ 300.410, 300.415 (removal actions), with §§ 300.420-300.435 (remedial actions). The district court concluded that MPCA conducted a remedial action at the McGuire site and compared that action against the remedial action requirements of the NCP. MPCA argues we must remand for further factual development of that issue, noting the obvious fact that lead contaminants were "removed" from the site. However, MPCA conducted the cleanup under state laws and regulations that permit the agency to incur and recover "response costs." State law does not distinguish procedurally between removal and remedial actions. Therefore, MPCA never made the determination required by § 300.415(b) of the NCP, a determination EPA must make before it may take emergency or short-term removal action. In these circumstances, we agree with the district court that the permanent nature of the McGuire site cleanup and the leisurely manner in which MPCA dealt with the problem make it appropriate to hold the agency to the NCP standards for remedial action.

The district court concluded that MPCA conducted the McGuire site cleanup in an arbitrary and capricious manner for the following reasons:

-- MPCA failed to undertake a feasibility study before selecting the soil washing remedy, as the NCP requires. See 40 C.F.R. §§ 300.430(a)(2), 300.430(e).

-- MPCA instead relied on EPA's May 1986 Site Assessment, but MPCA ignored the EPA contractor's warning that the soil washing option was "questionable" because it would not "address total lead concentrations," and its recommendation that "complete removal of the contaminated material would be the most environmentally sound and cost-effective method at this site." While

the State "may take some risks to develop experimental remedies," the court observed, "the risk the State took here was without any record support."

-- MPCA acted inconsistently with the NCP when it gave the public minimal public notice of the proposed soil washing remedy and contracted to implement that remedy before the public comment period ended. As a consequence, "defendants were denied any real opportunity to comment on the State's clean-up plans."

-- The experimental soil washing remedy "failed, forcing the State to hire new contractors, at increased expense, to clean up the site."

Our review of the MPCA administrative record supports these conclusions. The EPA site assessment team warned MPCA in May 1986 that soil washing was questionable and recommended complete removal. The Bureau of Mines, which had significant soil washing experience, had rejected soil washing as a way to remedy lead contamination. Yet MPCA went ahead with the soil washing option in 1991 without further feasibility study and in the face of an additional warning from its own contractor, Delta: "The disadvantages of soil washing are . . . the uncertainty in the effectiveness of the process and the relatively high costs." In addition, no preliminary studies were conducted despite MPCA's knowledge that MBI had never conducted a full-scale remediation project. MPCA did not verify MBI's financial stability nor require it to post a performance bond. The record reflects that MPCA obstinately insisted on employing an untried, high-risk, high-cost remedy; failed to adequately study the nature and extent of the contamination problem in advance; and failed to monitor MBI and modify the remedy when the unevaluated problem turned out to be greater than anticipated. We agree with the district court that appellees met their burden of proving this was arbitrary and capricious agency action inconsistent with the NCP within the meaning of 42 U.S.C. § 9607(a)(1-4)(A).

However, we disagree with the district court's decision to preclude the State from any cost recovery under CERCLA. The record leaves no doubt, indeed, appellees

virtually concede, that remedial action to clean up the McGuire site was appropriate under CERCLA. The statute provides that the State may recover "all costs . . . not inconsistent with the [NCP]." Therefore, the State may recover all costs except those that appellees prove were inconsistent with the NCP. See NEPACCO, 810 F.2d at 747. The district court erred in concluding without discussion that MPCA's arbitrary and capricious actions during the MBI phase of the cleanup completely bar the State from recovering all costs incurred. Thus, the case must be remanded.

An issue that is likely to emerge on remand is worthy of further comment. Appellees argue that MPCA was arbitrary and capricious not only in initially choosing the wrong remedy, but also in unreasonably and unnecessarily increasing the cost of the appropriate remedy ultimately implemented by RSI. In most cases, if the agency has chosen a remedial plan that is *not* arbitrary and capricious, such as the RSI remedy, a responsible person may not challenge portions of the costs incurred in implementing that remedy. This is because § 9607(a)(1-4)(A) permits recovery of "all costs," not merely "all reasonable costs." See Hardage, 982 F.2d at 1443; NEPACCO, 810 F.2d at 747-48; but see United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1508 (6th Cir. 1989), cert. denied, 494 U.S. 1057 (1990). However, those prior cases involved responsible persons that had been afforded prior notice of the proposed cleanup and an opportunity to undertake an agency-supervised cleanup at their own expense. Both CERCLA and the NCP require this kind of involvement of responsible persons before federal superfund monies are expended. See 42 U.S.C. §§ 9613(k)(2)(D), 9617; 40 C.F.R. §§ 300.400(b), 300.415(a)(2). Moreover, MPCA's statutory obligation to afford responsible persons prior opportunity to undertake a necessary cleanup is, if anything, even more explicit under state law. See Minn. Stat. § 115B.17, subd. 1(a)(1).

We agree with the district court that MPCA failed to meet its obligations to notify and involve responsible persons before undertaking to clean up the McGuire site. The State argues that the scrap dealers were not "known" responsible persons when MPCA authorized the expenditure of state superfund monies and commenced the

cleanup. But the scrap dealers were known generators, and Leder Brothers was known to have furnished *lead cable* for McGuire's insulation-burning operations. The agency clearly knew enough to decide that it would likely seek reimbursement from the scrap dealers under CERCLA or MERLA. Therefore, they should have been given a formal opportunity to comment on the proposed cleanup plan and to undertake the cleanup at their own expense. As the court said in Aetna Casualty & Surety Company v. Pintlar Corporation, 948 F.2d 1507, 1517 (9th Cir. 1991):

> The extent of CERCLA liability is far-reaching. The ability to choose the response action greatly empowers the government. In order to influence the nature and costs of the environmental studies and cleanup measures, [responsible persons] must get involved from the outset. In many instances, it is more prudent for [a responsible person] to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action.

See also Bell, 3 F.3d at 897; Key Tronic Corp. v. United States, 511 U.S. 809, 820 (1994) ("[t]racking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for").[3] Because MPCA's actions were inconsistent with the NCP in this regard, appellees are entitled to prove that this inconsistency caused the State to incur unreasonable or unnecessary response costs in implementing even an appropriate remedial action. The State may not recover response costs incurred in implementing appropriate remedial actions to the extent appellees prove on remand that they would have and could have accomplished the cleanup more cost effectively.

---

[3]It is also fundamentally fair to require the government to affirmatively involve potentially responsible parties before committing superfund resources because private parties may not obtain pre-enforcement review of proposed CERCLA response actions. See Gopher Oil Co. v. Bunker, 84 F.3d 1047, 1051 (8th Cir. 1996).

It is important to everyone that necessary environmental remediation be timely completed as cost effectively as possible. Therefore, the kind of arbitrary and wasteful agency action that occurred in this case cannot be rewarded. On the other hand, private parties that are responsible for necessary cleanups should not receive a financial windfall from the superfund because the environmental constable blundered. We believe the CERCLA cost recovery standards set forth in this opinion will encourage those involved in future cleanups to achieve the most cost-effective and environmentally appropriate solution.

## IV. The State's MERLA Claims.

The State also sued to recover its response costs under the state superfund statute, MERLA. The district court dismissed these claims as time-barred under MERLA's statute of limitations, a ruling the parties extensively debate on appeal. However, we need not decide this important issue of state law.

Though the two statutes have significant differences, MERLA "was patterned after its federal counterpart," CERCLA. Westling v. County of Mille Lacs, 581 N.W.2d. 815, 817 n.1 (Minn. 1998); Musicland Group, Inc. v. Ceridian Corp., 508 N.W.2d 524, 529 (Minn. App. 1993). MERLA allows the State to recover from responsible persons all "reasonable and necessary" response costs incurred by MPCA. See Minn. Stat. §§ 115B.04, subd. 1(a), 115B.17, subd. 6. However, before taking any remedial action, MPCA must "[r]equest any responsible party known to the agency to take actions which the agency deems reasonable and necessary," and "[d]etermine that the actions requested by the agency will not be taken by any known responsible party in the manner and within the time requested." Minn. Stat. § 115B.17, subd. 1(a)(1), (3). For the reasons stated in Part III of this opinion, we conclude that the State would not be entitled on remand to any greater recovery for its response actions under

-12-

MERLA than under CERCLA. Therefore, we need not further consider the MERLA claims.[4]

## V. The Blum Holdings Dissolution Issue.

In October 1994, A & D Recycling purchased the assets of Sam Blum Iron & Metal Company, and the seller changed its corporate name to Blum Holdings. In April 1995, Blum Holdings advised MPCA that it did undoubtedly sell "very small quantities" of insulated wire to McGuire and repurchase clean wire from him. Blum Holdings then filed a notice of intent to dissolve with the Minnesota Secretary of State, see Minn. Stat. § 302A.723, and the company sent notice of its intent to dissolve to MPCA as a creditor, see Minn. Stat. § 302A.727, subd. 1. MPCA served notice of its claim, and Blum Holdings rejected the claim on August 17, 1995. That gave the State until October 25, 1995, "to pursue any other remedies." Minn. Stat. § 302A.727, subd. 3(b). The State did not commence this lawsuit until January 1996. Accordingly, the district court dismissed the claim against Blum Holdings as barred by Minn. Stat. § 302A.727, subd. 3(d), because the State did not timely "initiate legal, administrative, or arbitration proceedings with respect to the claim."

On appeal, the State first argues that its RFI to Blum Holdings in 1989 and an April 1995 letter constitute the initiation of an administrative proceeding for purposes of § 302A.727, subd. 3(d). Like the district court, we disagree. This novel interpretation of the RFI is contrary to the cover letter which accompanied the RFI sent to Blum Holdings ("The main purpose of the RFI is to gather information . . ."), and it has no support in MERLA, the MPCA's regulations, or case law. The April 1995 letter was sent to Sam Blum and A & D Recycling, not Blum Holdings; the letter simply

_____

[4]The State's statement of issues presented for review does not challenge the district court's dismissal of the State's other state law claims. See F.R.A.P. 28(a)(3). That portion of the court's summary judgment rulings is therefore affirmed.

-13-

requested a meeting to explore the accuracy of Blum's prior denial of having furnished insulated wire to McGuire for burning. These were certainly preliminary steps in the MERLA enforcement process. Cf. Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 357 (8th Cir. 1998). But they were not the initiation of the kind of formal proceedings that § 302A.727, subd. 3(d), requires a creditor to commence to avoid the normal consequences of corporate dissolution. See Onan Corp. v. Industrial Steel Corp., 770 F. Supp. 490, 493-94 (D. Minn. 1989), aff'd, 909 F.2d 511 (8th Cir.), cert. denied, 498 U.S. 968 (1990).

The State alternatively argues that CERCLA preempts state dissolution statutes such as § 302A.727. This contention is foreclosed by NEPACCO, 810 F.2d at 746 (state law governs capacity to be sued under CERCLA), and Onan, 770 F. Supp. at 495. The order granting summary judgment in favor of Blum Holdings is affirmed.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion. The State's motion to strike appellees' appendices is denied.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-