FOR THE EIGHTH CIRCUIT

# United States Court of Appeals

_____

Nos. 99-1456/1871

_____

| | | |
|---|---|---|
| Union Pacific Railroad Company, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota |
| Reilly Industries, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:   October 18, 1999

Filed:   June 14, 2000

_____

Before McMILLIAN, HANSEN, and MORRIS SHEPPARD ARNOLD,
    Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Union Pacific Railroad Company (UP) appeals from a final judgment entered in the United States District Court[1] for the District of Minnesota in favor of Reilly Industries, Inc. (Reilly), on UP's claims for recovery of environmental cleanup costs or contribution under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601(a) et seq., the Minnesota Environmental

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Response and Liability Act (MERLA), Minn. Stat. § 115B.01 et seq., and Minnesota common law.  See Union Pacific R.R. Co. v. Reilly Indus., Inc., No. 4-96-660 (D. Minn. Dec. 28, 1998) (UP v. Reilly).  UP also appeals from a denial of a motion for post-judgment relief filed pursuant to Fed. R. Civ. P. 60(b).  See id. (Feb. 12, 1999). For reversal, UP argues that the district court erred in: (1) dismissing its CERCLA claims for failure to substantially comply with the National Contingency Plan (NCP); (2) dismissing its MERLA claims on statute of limitations grounds; (3) concluding that UP failed to prove its common law indemnity and contribution claims; (4) denying its Fed. R. Civ. P. 60(b) motion for relief from the judgment, and (5) determining the amount of UP's reasonable and necessary response costs and Reilly's portion of the responsibility.  For the reasons discussed below, we affirm.

Jurisdiction was proper in the district court based upon 28 U.S.C. §§ 1331, 1332. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291.  The notices of appeal were timely filed pursuant to Fed. R. App. P. 4(a).

**Background**

The following is a brief summary of the undisputed facts as set forth in greater detail in the district court's summary judgment order dated November 3, 1997.  See id., slip op. at 1-12 (Nov. 3, 1997). From 1903 until approximately 1919, a corporate predecessor of Reilly, Republic Creosoting Company, operated a creosoting plant on a five-acre parcel of land in Minneapolis, Minnesota, which was located within a 23.8-acre tract of land owned and operated as a railroad switching yard by a corporate predecessor of UP, Chicago Great Western Railway Company. (Hereinafter, "Reilly" will be used to refer to Republic Creosoting Company and "UP" will be used to refer to Chicago Great Western Railway Company and other corporate predecessors.) Reilly leased the five-acre parcel from UP.  Reilly's on-site operations included treating wood products such as paving blocks and railroad ties with creosote, which contains polynuclear aromatic hydrocarbons (PAHs).

-2-

In 1987, the Minneapolis Community Development Agency (MCDA) entered into an agreement with UP to conduct tests on the 23.8-acre tract to assess possible environmental concerns which might arise if UP were to sell the property. Barr Engineering was hired to conduct a preliminary environmental investigation, and it produced a document referred to as the "Barr Report."

In 1990, UP engaged in negotiations to sell the 23.8-acre tract to the University of Minnesota (the University). At issue in the negotiations was the anticipated need to clean up the soil and groundwater contamination. UP hired Dahl & Associates, Inc., (Dahl), to investigate the contamination further. Dahl researched the historical ownership and uses of the property, conducted limited subsurface sampling and analyses, and issued a "Phase I and Phase II Property Evaluation," dated June 18, 1990. According to Dahl, the soil and groundwater were contaminated with PAHs at or near the five-acre parcel formerly leased by Reilly (hereinafter "the UP site"). Dahl conducted additional sampling and analyses and issued a "Phase II Property Evaluation," dated August 1, 1990, which purported to document the contamination and recommended enrollment of the UP site in the Minnesota Pollution Control Agency (the MPCA)'s Voluntary Investigation and Cleanup (VIC) Program.

In a letter dated August 17, 1990, UP informed Reilly's general counsel of the results of Dahl's investigations.

Meanwhile, in July 1990, the University agreed to purchase the 23.8-acre tract from UP. The sale of the property occurred in October 1990, and, as part of the sale, UP agreed to undertake the environmental remediation.

UP directed Dahl to consider the known remediation options (which included bioremediation, thermal desorption, incineration, and landfilling) and to recommend a course of action. Dahl initially recommended using bioremediation, but changed its recommendation after the MPCA, in February 1993, informed UP and Dahl that the

-3-

PAH cleanup goal would be in the range of 10 to 100 parts per million (ppm). That range was lower than Dahl's original expectation. UP and Dahl then decided to focus on thermal desorption (also referred to as "high temperature thermal desorption" or "HTTD"), which was believed to be more effective than bioremediation. UP selected Advanced Soil Technologies, Inc. (AST), to conduct the thermal desorption cleanup process. In May 1994, the MPCA formally established a cleanup goal for the UP site of 10 ppm PAH.

On August 1, 1994, a public meeting was held at which MPCA informed local residents of clean up projects at several locations, including the UP site. The notice for the meeting stated that a fact sheet would be distributed. A fact sheet was distributed at the meeting, and it stated that the UP site was required to meet the cleanup standards for residential property. It further stated that several options for remediating the UP site had been considered, and that "[t]he only remedy that results in complete destruction of PAHs in a reasonable amount of time is high-temperature thermal desorption." Slip op. at 9 (Nov. 3, 1997) (quoting fact sheet). A spokesperson for the MPCA described the thermal desorption process and stated that it had been selected from among several alternatives.

Following MPCA's verbal approval of Dahl's proposed thermal desorption plan, soil excavation at the UP site began in November 1994. On November 30, 1994, a second public meeting was held. The notice of that meeting stated:

> The purpose of this follow-up meeting is to discuss and receive comments on the specifics of the cleanup action proposed for the former CN&W property. A member of the [MPCA] and the consultant who will conduct the cleanup will be available at the meeting to answers questions.

> A Remedial Action Workplan (Workplan) has been submitted to the [MPCA]. The full administrative record on this site and the Workplan is available for review at the Minnesota Pollution Control Agency . . . .

> Please provide any written comments on the Workplan . . . by
> December 1, 1994.

Id. at 10 (quoting public notice).

The public was informed at the November 30 meeting that MPCA had verbally approved the thermal desorption plan, that most of the soil had been excavated, and that the comment period regarding the cleanup action would end at 10 a.m. on December 1, 1994 (the following day).

The soil excavation was completed on December 16, 1994, and thermal treatment of the soil began on December 28, 1994. On January 13, 1995, MPCA gave formal written approval of the thermal desorption treatment, which was concluded on January 27, 1995. On February 7, 1995, MPCA approved the backfilling of the treated soil.

On March 30, 1994, Dahl submitted a Remedial Action Implementation Report, documenting the remedial action, to the MPCA. MPCA thereafter confirmed that the cleanup goal had been achieved and approved Dahl's Remedial Action Implementation Report on September 18, 1995.

In February 1995, UP notified Reilly that its remediation costs had totaled $1,025,518, excluding attorneys' fees and interest.

UP filed this action on December 22, 1995, alleging that Reilly is liable for some or all of UP's response costs under CERCLA, 42 U.S.C. §§ 9607(a), 9613(f). In addition, UP brought a MERLA claim and claims of waste, nuisance, trespass, strict liability, indemnity, and contribution under Minnesota common law. The parties filed cross-motions for summary judgment. The district court granted partial summary

judgment for Reilly and dismissed UP's CERCLA claims upon determining that UP had failed to substantially comply with NCP requirements that apply to remedial actions.[2] See UP v. Reilly, slip op. at 14-24, 25 (Nov. 3, 1997).[3] In a later order, the district court denied the parties' cross-motions for summary judgment on the state law claims, but held that UP's MERLA claim and certain state common law claims would be subject to a six-year statutory limitations period commencing on the date that UP knew or should have known the property had been damaged. See id. (Feb. 9, 1998).

The case went to trial. The district court submitted all of the remaining claims to the jury, except for the MERLA claim and the indemnity and contribution claims which were equitable in nature. The district court used a special verdict form which required the jury to decide liability on the appropriate state law claims and to resolve factual disputes underlying the statute of limitations issue. The jury's responses on the special verdict form rendered UP's state law claims, except for the indemnity and contribution claims, barred by the statute of limitations. See id. at 5-6 (Dec. 28, 1998) (post-trial order). On the indemnity claim, the district court held that UP had failed to meet its burden of proof because it had not established an express or implied legal relationship which rendered Reilly entirely responsible for UP's expenditures. See id. at 11. On the contribution claim, the district court held that equitable principles and

---

[2]The district court noted that it is undisputed in the present case that the response action at the UP site was a "remedial," as opposed to a "removal action," which entails less stringent regulatory oversight. See Union Pacific R.R. Co. v. Reilly Indus., Inc., No. 4-96-660, slip op. at 15 n.1 (D. Minn. Nov. 3, 1997) (UP v. Reilly; accord County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1512 n.6 (10th Cir. 1991) (per curiam) (discussing distinction between remedial actions and removal actions).

[3]In the same order, the district court dismissed without prejudice UP's state law claims, see UP v. Reilly, slip op. at 24, 25 (Nov. 3, 1997), but subsequently the district court reinstated those claims upon determining that it could exercise jurisdiction based on diversity of citizenship. See id. (Jan. 12, 1998) (order granting motion for reconsideration).

public policy mandated judgment for Reilly, especially in light of UP's unexcused delay in bringing its claim. See id. at 13-15. Judgment was entered for Reilly, and UP appealed.

UP subsequently sought relief from the judgment in the district court pursuant to Fed. R. Civ. P. 60(b) on the ground that the Eighth Circuit's then-recent decision in Minnesota v. Kahlman W. Abrams Metals, Inc., 155 F.3d 1019 (8th Cir. 1998) (Abrams Metals), clarified applicable CERCLA standards and warranted reinstatement of UP's CERCLA claims. The district court denied UP's post-judgment motion, explaining that it no longer had jurisdiction over the case and, in any event, that Abrams Metals would not apply to the factual circumstances of the present case. See UP v. Reilly, slip op. at 2 (Feb. 12, 1999). UP filed a second appeal (from the denial of post-judgment relief), and the two appeals were consolidated in this court.

**Discussion**

CERCLA claims

UP first argues on appeal that the district court erred in granting summary judgment for Reilly on its CERCLA claims. The district court held that UP failed as a matter of law to substantially comply with the NCP because, under the undisputed facts of the present case, (1) UP did not provide a meaningful opportunity for public participation and comment in the selection of the response action in accordance with 40 C.F.R. § 300.430(f)(2),(3), and (6), as set forth in 40 C.F.R. § 300.700(c)(6), and (2) UP failed to conduct a remedial investigation and feasibility study (RI/FS) before selecting a remedy in accordance with 40 C.F.R. § 300.430(d), (e), as set forth in 40 C.F.R. § 300.700(c)(5)(viii). See UP v. Reilly, slip op. at 16-23 (Nov. 3, 1997).

We review a grant of summary judgment *de novo*. The question before the district court, and this court on appeal, is whether the record, when viewed in the light

most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir. 1990).

The NCP, more fully known as the National Oil and Hazardous Substances Pollution Contingency Plan, see 40 C.F.R., Part 300, is comprised of EPA regulations setting forth procedures and standards for responding to releases of hazardous substances. See, e.g., Abrams Metals, 155 F.3d at 1024. The NCP is designed to promote cost-effective measures to protect public health and the environment. See id. Under CERCLA, a private party cannot recover its reasonable and necessary response costs from a responsible party unless it has complied with the NCP. See 42 U.S.C. § 9607(a)(4)(B) (responsible parties shall be liable for any necessary costs of response incurred by any other person consistent with the NCP); Farmland Indus., Inc. v. Morrison-Quirk Grain Corp., 54 F.3d 478, 481 (8th Cir. 1995) ("NCP compliance is a prerequisite for recovery of response costs under CERCLA."). In a 1990 revision of the NCP regulations, the EPA made clear that "substantial" compliance with the NCP is the applicable standard. See Bedford Affiliates v. Sills, 156 F.3d 416, 427 (2d Cir. 1998) (Bedford Affiliates); 55 Fed. Reg. 8666, 8792-94 (Mar. 8, 1990). Under this standard, "an 'immaterial or insubstantial' deviation from the [NCP] will no longer cause the cleanup to be deemed inconsistent." Bedford Affiliates, 156 F.3d at 427 (citing 40 C.F.R. § 300.700(c)(4)). Whether there has been substantial compliance is a mixed question law and fact, subject to *de novo* review. See id.

Failure to provide a meaningful opportunity for public participation and comment in the selection of a remedial action at a particular cleanup site is inconsistent with the NCP. See 40 C.F.R. § 300.700(c)(6) ("private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the

-8-

response action"); accord County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1514 (10th Cir. 1991) (Tinney) (the NCP requires "at a minimum, that a private party attempting to act 'consistent with the national contingency plan' provide an opportunity for public comment on its selection of the response action for the site"). The federal regulations require, among other things, that the lead agency, after properly providing public notice of a proposed remedial plan and making the plan publicly available for review, "[p]rovide a reasonable opportunity not less than 30 calendar days, for submission of written and oral comments on the proposed plan and the supporting analysis and information located in the information repository, including the RI/FS." 40 C.F.R. § 300.430(f)(3)(i)(C). Before that can occur, the agency must "[m]ake the proposed plan and supporting analysis and information available in the administrative record." Id. § 300.430(f)(3)(i)(B). Moreover, the 30-day comment period is among the prerequisites for the creation of a record of decision (ROD), which the lead agency must make "available for public inspection and copying at or near the facility at issue prior to the commencement of any remedial action." Id. § 300.430(f)(6)(ii).

In challenging the district court's determination that UP failed as a matter of law to substantially comply with the NCP's public participation and comment provisions, UP first emphasizes that, under the applicable 1990 version of the NCP, "immaterial or insubstantial deviations" are permitted. UP also emphasizes that the public comment provision of the NCP does not use mandatory language; it states that "[private parties undertaking response actions *should* provide an opportunity for public comment concerning the selection of the response." 40 C.F.R. § 300.700(c)(6) (emphasis added). These provisions, UP argues, have been interpreted to invoke a "case-by-case balancing approach that evaluates clean-up efforts as a whole." Brief for Appellant at 21 (quoting Bedford Affiliates, 156 F.3d at 428). In the present case, UP contends, the undisputed facts show that the steps it took to provide an opportunity for public participation and comment were substantially consistent with the NCP.

UP highlights the undisputed facts that two public meetings were held, that notice of the meetings was given in advance through widely distributed local newspapers and by mail to local residents and public officials, that the remedial alternatives including thermal desorption were specifically discussed at the meetings, that transcripts of both meetings were created and made publicly available, that an opportunity for written comments was provided, and that no objections to the proposed remedy were ever received at the meetings or in writing. As to the district court's conclusion that thermal desorption was a forgone conclusion by the time the first meeting was held, UP argues that the contract it had with Dahl specifically allowed UP to unilaterally cancel pending approval of the thermal desorption remedy by the MPCA and that MPCA was not even aware of the Dahl contract before it approved UP's remedial plan. UP admits that soil excavation had already began by the time the second meeting occurred, but discounts the significance of that fact. UP notes that the first meeting had already occurred some three months earlier. Moreover, UP argues, because soil excavation was consistent with landfilling and bioremediation as well as thermal desorption, thermal desorption was not necessarily the final remedial selection at the time soil excavation occurred.

UP alternatively argues that the MPCA's involvement at every stage of the remedy selection process satisfied the NCP's public participation and comment requirements because state agency involvement in the selection of a remedy may "substitute" for public participation and comment. See Brief for Appellant at 28-31(citing, e.g., Public Serv. Co. v. Gates Rubber Co., 175 F.3d 1177 (10th Cir. 1999); Bedford Affiliates, 156 F.3d at 428; General Elec. Co. v. Litton Bus. Sys., Inc., 715 F. Supp. 949 (W.D. Mo. 1989), aff'd, 920 F.2d 1415 (8th Cir. 1990) (Litton), cert. denied, 499 U.S. 937 (1991)). UP argues that this court's recent decision in Abrams Metals mandates such a conclusion as a matter of law. UP also suggests that Reilly cannot show prejudice resulting from UP's alleged lack of substantial compliance with the public participation and comment requirements because UP informed Reilly before the August 1, 1994, meeting that it considered Reilly a responsible party and Reilly was,

-10-

at all relevant times, aware of and able to participate in the remedy selection process. In sum, UP argues that it substantially complied with the public participation and comment provisions of the NCP as a matter of law.  We disagree.

While UP's noncompliance with the NCP's public participation and comment provisions was not as blatant as that of the plaintiff in Tinney,[4] cited by Reilly, we nevertheless agree with the district court's determination that UP failed to substantially comply, as a matter of law.  To begin, the selection of the thermal desorption remedy was – for purposes of allowing meaningful public participation and comment – a foregone conclusion prior to the meeting on August 1, 1994.  We agree with the district court's conclusion that there is no genuine dispute as to that fact.

The public was informed at the August 1 meeting that bioremediation had been considered and rejected, recycling had been considered and rejected, landfilling had been considered and rejected, but – in contrast – thermal desorption had *not* been rejected and, in fact, plans were already in place to use thermal desorption to address the PAH contamination at the UP site.  See Appellant's Appendix (Vol. 4) at 1126-33 (transcript of  public meeting on August 1, 1994).[5]  Although the public was given

---

[4]See County Line Inv. Co. v. Tinney, 933 F.2d at 1514-15 ("It is undisputed that the New Owners provided no . . . opportunity for public comment on their response action at the Landfill.  Accordingly, under . . . the substantial compliance standard stated in the 1990 NCP, the costs incurred by [the] New Owners in closing the Landfill were not consistent with the NCP and hence are not recoverable.") (footnote omitted).

[5]Lynn Grigor, a representative of the VIC program, discussed the remediation options that had been considered.  With respect to bioremediation, she said:

> We looked at using the local microorganisms to complete the cleanup, but . . . we found that it would just take too long a period of time. . . . We couldn't use bioremediation.

With respect to recycling, she said:

an opportunity to ask questions about the nature and effects of the thermal desorption

---

> We also looked at re-using the material in the creosote soils in the asphalt, in building materials; say for a parking lot. . . . [W]e decided it just wasn't reasonable to use it in asphalt.

With respect to landfilling, she said:

> The third option, which we really didn't like, was to take this material to a landfill. . . . [But,] [w]hat we wanted here was a permanent remedy where the railroad would do a cleanup and then walk away from the property and have the property ready for development and not have to worry about future cleanup of a landfill.

With respect to thermal desorption, she said:

> We heard about a system called, "Thermal desorption with an afterburner" and we actually do have a unit, which as of mid-August, we hope to have a permit for use in Minnesota.

> . . . .

> We hope to have the desorption unit here sometime in September and we hope to do a quick run-through of the soil. It should take about two weeks, we figure, to get the soil all cleaned up and once this soil is cleaned up; the unit, which is mobile, will go to another site.

> So we're only going to be cleaning up the soils from this particular piece of property, at this location, and then [the thermal desorption unit] it will go on to another location.

Appellant's Appendix (Vol. 4) at 1126-33 (transcript of Aug. 1, 1994, public meeting); see also id. at 1259-60, 1270-71 (transcript of Nov. 30, 1994, public meeting) (similarly stating that bioremediation was considered and rejected and that "[w]e were quite happy when AST came along with a technology that would work, and we've [the MPCA] kind of been working with them [AST] quite a bit to see them through the process") (statement of Jerry Stahnke, representing the MPCA).

process, there was no indication that the *selection* of the response action was open to discussion or change. On October 25, 1994, Dahl submitted to the MPCA its written remedial action work plan for conducting the thermal desorption cleanup at the site ("the work plan"). The MPCA verbally approved the work plan on November 14, 1994. Soil excavation also began in November 1994. At the second meeting on November 30, 1994, the public was informed that the work plan was publicly available. However, the period for submitting written or oral comments lasted only until the next day, December 1, 1994. See id. at 1280-81 (statement at the meeting that the comment period was open "until tomorrow"). It is therefore beyond genuine factual dispute that the public was not given "a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments on the proposed plan and the supporting analysis and information located in the information repository." 40 C.F.R. § 300.430(f)(3).[6] Furthermore, it is undisputed that soil excavation began in November 1994. Soil excavation is an early and essential step in the thermal desorption process. See Appellant's Appendix (Vol. 4) at 1261 (statement of Bob Wills, representative of AST, at November 30, 1994, public meeting, describing thermal desorption process). Therefore, notwithstanding UP's argument that soil excavation was also consistent with landfilling and bioremediation and thus not indicative that thermal desorption was at

---

[6]The notice announcing the meeting on November 30, 1994, stated:

> A Remedial Action Workplan (Workplan) has been submitted to the [MPCA]. The full administrative record on this site and the Workplan is available for review at the Minnesota Pollution Control Agency . . . Please provide any written comments on the Workplan . . . . by December 1, 1994.

UP v. Reilly, slip op. at 10 (Nov. 3, 1997) (quoting public notice (contained in Appellant's Appendix (Vol. 4) at 1252)). The record does not clearly reveal the date on which that notice was publicized; however, UP makes no allegation, and we discern no factual dispute, that this notice was publicized at least 30 days before the December 1, 1994, deadline for submission of written and oral comments.

-13-

that time the final remedial selection, the soil excavation was part of the thermal desorption remedial action. Given the facts that the November 30 meeting had not even occurred and the period for public comment had not even been completed at that time, it is beyond factual dispute that UP commenced the remedial action before the MPCA had the opportunity to make the record of decision, as defined under the NCP, available for public inspection and copying at or near the UP site, in violation of the NCP. See 40 C.F.R. § 300.430(f)(6)(ii). In sum, we agree with the district court that UP failed as a matter of law to substantially comply with the NCP's public participation and comment requirements in the selection of the remedial action.

We now turn to UP's argument that MPCA's involvement in the remediation selection process effectively fulfilled UP's responsibility to provide an opportunity for meaningful public participation and comment. To begin, we do not quarrel with the Second Circuit's observation that, "[w]here a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation *may* fulfill the public participation requirement." Bedford Affiliates, 156 F.3d at 428 (emphasis added). However, critical factual differences between Bedford Affiliates and the case at bar warrant different outcomes. Particularly, in Bedford Affiliates, id. at 429, "none of the parties to the action dispute[d] the quality or cost of [the plaintiff's] cleanup efforts." Thus, because the defendant's primary interest in demanding enforcement of the public participation and comment requirements would presumably have been to allow its own participation and input in the quality-versus-cost analysis, the Second Circuit reasoned that "to preclude [the plaintiff's] recovery solely because of the lack of public comment would ignore the equitable component that Congress and the EPA built into the cleanup costs decisions." Id. In other words, the Second Circuit recognized that it would be inconsistent with the equitable underpinnings of CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), to hold as a matter of law that a plaintiff cannot seek contribution from another potentially responsible person (PRP) based on noncompliance with the public participation and comment provisions of the NCP where the responsible state agency

-14-

has been "extensive[ly] involv[ed]" in the formulation and execution of the response action *and the PRP does not dispute the quality or cost of the remedy*. In the present case, by contrast, Reilly has consistently asserted in the litigation that UP incurred unnecessary response costs under CERCLA, 42 U.S.C. § 9607(a)(4). That fact, combined with UP's lack of substantial compliance with the NCP's public participation and comment requirements, precludes us from holding that MPCA's involvement in the selection and execution of the remedy excuses UP's noncompliance. Cf. Litton, 920 F.2d 1415 (in *removal* action entailing extensive state and federal agency involvement, holding that private party could recover response costs from responsible party because the plaintiff's conduct was consistent with the applicable NCP guidelines governing removal actions).

Moreover, contrary to UP's argument, our holding today comports with Abrams Metals. In Abrams Metals, the cost recovery action was brought by the state, not a private party as in the present case. In Abrams Metals, this court observed:

> If the State establishes that it incurred response costs to remedy a release or threatened release of hazardous substances from a facility, and that defendants are responsible persons, then defendants have the burden of proving that the costs incurred were inconsistent with the NCP, an issue that is judicially reviewed under the arbitrary and capricious standard of review for agency action.

155 F.3d at 1023; see 42 U.S.C. § 9607(a)(4) (to recover response costs from a responsible party, a private party must show that it incurred "necessary costs of response . . . consistent with the [NCP]", whereas a state may recover "all costs of removal or remedial action . . . not inconsistent with the [NCP]"). In Abrams Metals, 155 F.3d at 1025, this court held that – although the state was not precluded from recovering *all* costs under CERCLA – the state was precluded from recovering those costs which the defendants had proven were the result of arbitrary and capricious noncompliance with the NCP. Accord Washington State Dep't of Transp. v.

-15-

Washington Natural Gas Co., 59 F.3d 793, 800-05 (9th Cir. 1995) (state department of transportation seeking response costs under CERCLA from private parties is considered the state for purposes of affording it the presumption of consistency with the NCP, but could not recover response costs because its "high degree of inconsistency with the requirements set forth in the NCP" was "arbitrary and capricious").  Thus, although "state participation *may* fulfill the public participation requirement," Bedford Affiliates, 156 F.3d at 428 (emphasis added), Abrams Metals clarifies that extensive state involvement is not a *per se* substitute for substantial compliance with the public participation and comment requirements of the NCP.

In sum, we hold that the district court did not err in dismissing UP's CERCLA claims on summary judgment because UP failed as a matter of law to substantially comply with the NCP's public participation and comments requirements.[7]

MERLA claim

UP next argues, with respect to its MERLA claim, that the district court erroneously held that the applicable six-year statute of limitations period began to run on the date UP knew or should have known about the creosote contamination, rather than the date upon which UP first incurred response costs.  UP argues that, because MERLA specifically states that a claim for personal injury accrues according to the discovery rule (i.e., when the plaintiff knew or should have known of the injury) but is silent as to when a claim for property damage accrues, the state legislature must have intended not to apply the discovery rule to claims for property damage.  UP relies on statutory construction and policy arguments to urge us to hold that its claim accrued

---

[7]Because we dispose of the CERCLA claims on the basis of UP's failure as a matter of law to substantially comply with the NCP's public participation and comment requirements, we decline to address the district court's additional holding that UP failed as a matter of law to substantially comply with the NCP's RI/FS requirements.

-16-

once response costs were incurred. Reilly, on the other hand, maintains that a MERLA claim for property damage accrues "when the act occurs and some damage results." Brief for Appellee at 42. While in some instances the injurious act may precede the plaintiff's actual or constructive knowledge of the resulting damage, Reilly contends that, in the present case, it is undisputed that the contamination and UP's knowledge thereof were "concurrent." See id. at 41 n.20.

In its order dated February 9, 1998, the district court held that UP's state common law claims and its MERLA claim were governed by the six-year statute of limitations set forth in Minn. Stat. § 541.05 subd. 1, and that, "[b]ecause [§ 541.05 subd. 1] does not provide for an accrual date for the recovery of response costs, . . . the same accrual date applies under MERLA as provided for under Minnesota common law for damages to real property." UP v. Reilly, slip op. at 10 (Feb. 9, 1998). The district court noted that under the common law, accrual occurs when the plaintiff knows or reasonably should know of the damage to property. See id. In a later order, dated May 26, 1998, the district court considered for the first time the relevance of 42 U.S.C. § 9658,[8] in the context of denying a motion by Reilly for reconsideration of its earlier decision regarding the applicable accrual date. The district court reasoned:

---

[8]Section 9658 provides in relevant part:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1).

"CERCLA preempts Minnesota's statute of limitations for hazardous substance cases and imposes the federally required commencement date: the date that [UP] knew or reasonably should have known of the contamination." See id. at 16-20 (May 26, 1998). We essentially agree.

> The "federally required commencement date" is "the date the plaintiff knew (or reasonably should have known)" that the hazardous substance caused or contributed to the personal injury or property damages. 42 U.S.C. § 9658(b)(4)(A). Practically speaking, CERCLA essentially preempts state statutes of limitations if those state law claims are based upon exposure to hazardous substances released into the environment and the applicable limitations period provides for an earlier commencement date than federal law.

Tower Asphalt, Inc. v. Determan Welding & Tank Serv., 530 N.W.2d 872, 875 (Minn. Ct. App. 1995) (citing cases).

However, under § 9658, the federally required commencement date arguably yields to state law if the commencement date under the applicable state statute of limitations is *later* than that federally required commencement date. In other words, if MERLA's limitations period commences when response costs are first incurred, as UP now contends, then *that* commencement date arguably should govern in the present case according to the terms of § 9658. We must therefore determine when the MERLA limitations period commences under Minnesota law.

We decide questions of state law *de novo*. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991). Our interpretation of state law must comport with pertinent decisions of the Minnesota Supreme Court, but, if none are available, we look to related state court precedents, analogous decisions, considered dicta, and other reliable sources in an effort to determine what the Minnesota Supreme Court's decision would be. See Lindsay Mfg. Co. v. Hartford Accid. & Indem. Co., 118 F.3d 1263, 1276-68

-18-

(8th Cir. 1997). In the present case, we conclude, as did the district court, that the Minnesota Supreme Court would apply the common law discovery rule for determining when to commence the six-year statutory limitations period for a MERLA claim. See UP v. Reilly, slip op. at 9-10 (Feb. 9, 1998) (citing Minnesota Mining & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 183-84 (Minn. 1990) ("The advent of MERLA and other environmental statutes have merely changed the form of the liability . . . not the nature of that liability. . . . The MERLA remedies merely update the old statutory and common law liabilities . . . . The MERLA clean up requirement did not expand the common law remedy for pollution of property . . .")). Therefore, because the state law commencement date is the same as the federally required commencement date, the six-year limitations period for UP's MERLA claim commenced when UP knew or reasonably should have known of the creosote contamination at the UP site. See id. at 18-19. In accordance with the well-supported factual finding that UP knew or reasonably should have known about the creosote contamination more than six years before it commenced this litigation,[9] we hold that the district court did not err in dismissing UP's MERLA claim as barred by the statute of limitations.

---

[9]The jury was required to make an advisory finding as to when UP knew or should have known the property was damaged by creosote. In response to an interrogatory, the jury found that UP knew or should have known about the creosote contamination prior to December 22, 1988, more than six years prior to the commencement of this action.

-19-

Indemnity and contribution claims

Finally, UP argues that the district court erred in entering judgment for Reilly on its common law claims seeking indemnification or contribution. See UP v. Reilly, slip op. at 9-15 (Dec. 28, 1998). UP maintains that the district court's disposition of these equitable claims is inconsistent with Minnesota law and contrary to principles of equity, justice, and sound public policy. We disagree, and affirm the district court on the indemnity and contribution claims for the reasons set forth in the district court's opinion. See id.

As the district court explained, UP's indemnity claim fails because "[a] party seeking indemnity must show an express contractual relationship or implied legal duty that requires one party to reimburse the other entirely." Id. at 10 (citing Hendrickson v. Minnesota Power & Light Co., 104 N.W.2d 843, 847 (Minn. 1960), overruled in part by Tolbert v. Gerber Indus., Inc., 255 N.W.2d 362, 367-68 & n.11 (Minn. 1977)[10]; Blomgren v. Marshall Management Servs., Inc., 483 N.W.2d 504, 506 (Minn. Ct. App. 1992)). In the present case,

> [UP] has not proven any express or implied legal relationship that would require Reilly to be wholly responsible for [UP's] expenditures. In fact, the court has specifically found that both Reilly and [UP] are responsible for the reasonable response costs incurred by [UP].

Id. at 11.

---

[10]Hendrickson v. Minnesota Power & Light Co., 104 N.W.2d 843, 847 (Minn. 1960) (Hendrickson), was overruled in part by Tolbert v. Gerber Indus., Inc., 255 N.W.2d 362, 367-68 & n.11 (Minn. 1977) (Tolbert). However, Tolbert did not affect the above-quoted general statement regarding indemnity liability for which the district court cited Hendrickson as authority. See Blomgren v. Marshall Management Servs., Inc., 483 N.W.2d 504, 506& n.3 (Minn. Ct. App. 1992).

As to the contribution claim, the district court correctly noted that UP has failed to establish that it and Reilly share a common liability as joint tortfeasors to an injured third party, with that common liability existing at the time the tort was committed, as generally required under Minnesota law. See id. at 9-13 (citing, e.g., Vesely, Otto, Miller & Keefe v. Blake, 311 N.W.2d 3, 4-5 (Minn. 1981)). The district court observed, however, that Minnesota courts "will sometimes allow contribution actions despite the absence of common liability," because contribution is governed by equity. Id. at 13 (citing Lambertson v. Cincinnati Corp., 257 N.W.2d 679, 688 (Minn. 1977) ("Contribution is a flexible, equitable remedy designed to accomplish a fair allocation of loss among parties. Such a remedy should be utilized to achieve fairness on particular facts, unfettered by outworn technical concepts like common liability."); United States v. J&D Enters., 955 F. Supp. 1153, 1157 (D. Minn. 1997) (noting that indemnity is governed by equity and, consequently, "does not lend itself to hard-and-fast rules"; indemnity will not, however, be permitted "where its application would contravene public policy")).

We assume for the sake of argument that the Minnesota Supreme Court would allow UP's common law contribution action to proceed, absent common liability, if equitable and public policy considerations warranted the action. Accordingly, we now assess those considerations in the present case.

To begin, as the district court noted, UP was not without a legal remedy under Minnesota law. UP had a MERLA claim that was barred only because of UP's own failure to bring its claim within the applicable statutory limitations period. Therefore, as the district court reasoned, while the Minnesota courts might permit a claim for contribution where an otherwise available legal remedy was foreclosed by circumstances beyond the plaintiff's control, that could not be said about UP in the present case. UP's untimeliness was a matter of its own doing. In our opinion, therefore, equitable considerations disfavor UP's position.

Moreover, we agree with the district court that public policy weighs against allowing UP's contribution claim. As the district court reasoned,

> [T]o grant a party the option of resting on its MERLA rights would be to grant it the option of sitting quietly on its polluted property. And this, of course, would be contrary to a "primary goal of [CERCLA['s] and MERLA's] private cost recovery framework[s]," namely, "to 'encourage timely cleanup of hazardous waste sites.'"

Id. at 14 (quoting Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 935 (8th Cir. 1995) (quoting Litton, 920 F.2d at 1417)).

In sum, we hold that the district court did not err in granting judgment for Reilly on UP's common law claims for indemnity and contribution.[11]

Each of UP's remaining arguments on appeal is either meritless or moot in light of this opinion.

**Conclusion**

For the reasons we have stated, the judgment of the district court is affirmed.

---

[11]Because UP's common law indemnity and contribution claims are not viable under Minnesota state law, the district court declined to reach the question of whether those claims are otherwise preempted by CERCLA. See UP v. Reilly, slip op. at 15 n.3 (Dec. 28, 1998). We similarly decline to address the preemption issue at this time.

A true copy.

Attest:

U..S. COURT OF APPEALS, EIGHTH CIRCUIT.